## COMMONWEALTH *vs.* NEIL ENTWISTLE.

Middlesex. April 6, 2012. - August 14, 2012.

Present: IRELAND, C.J., SPINA, CORDY, GANTS, & DUFFLY, JJ.

*Homicide. Constitutional Law,* Search and seizure, Jury. *Search and Seizure,* Emergency. *Jury and Jurors. Practice, Criminal,* Capital case, Motion to suppress, Jury and jurors, Empanelment of jury, Voir dire.

A Superior Court judge did not err in denying the criminal defendant's pretrial motion to suppress evidence obtained via two warrantless searches of his house, where each search was justified under the "emergency aid" exception to the warrant requirement, in that, with respect to the first entry, police had a reasonable basis to believe that something unfortunate might have happened that rendered the defendant's wife unable to communicate with her mother and friends, and the conduct of the police was reasonable in the circumstances, given that the plain view observation of a bill containing an automobile vehicle identification number was appropriate and the improper turning on of a camera did not contribute to the verdict obtained [212-218]; and likewise, with respect to the second search, an even greater objective basis existed to fear for the health and safety of the family, and an objective analyst would conclude that the search conducted after the first entry had not reasonably eliminated the risk that a missing person was in need of assistance inside the home, and the search did not exceed the objectively reasonable basis, given that, when police smelled a foul odor upon entering, they reasonably followed the smell of decomposing bodies to its source [218-219].

At a murder trial, the process of selecting the jury did not deny the defendant his constitutional right to a fair and impartial jury, where the defendant failed to demonstrate that, because of the extraordinary circumstances of pretrial publicity, the community's prejudgment of the case was substantial enough that empanelling impartial jurors would not be possible; and where the judge conducted a careful, balanced, and thorough voir dire that addressed the risks posed by the pretrial publicity and did not abuse her discretion in concluding that the jury selected were fair and impartial. [219-225]

INDICTMENTS found and returned in the Superior Court Department on March 28, 2006.

A pretrial motion to suppress evidence was heard by *Diane M. Kottmyer,* J., and the cases were tried before her.

*Stephen Paul Maidman* (*Stephanie Page*, Committee for Public Counsel Services, with him) for the defendant.

*Casey E. Silvia*, Assistant District Attorney (*Michael L. Fabbri*, Assistant District Attorney, with her) for the Commonwealth.

GANTS, J. On the evening of Sunday, January 22, 2006, the defendant's wife and their nine month old daughter were found dead in a bed in the master bedroom of their home in Hopkinton. His wife had been shot once in the forehead; his daughter had been shot in the abdomen from close range while cradled in her mother's arms, and the bullet had exited the daughter and entered her mother's breast. The defendant, a British citizen, was charged with their murders and extradited from the United Kingdom, where he had traveled early in the morning of Saturday, January 21. A Superior Court jury convicted the defendant of two indictments charging murder in the first degree on a theory of deliberate premeditation, in violation of G. L. c. 265, § 1.[1]

On appeal, the defendant raises two issues. First, he argues that the motion judge (who was also the trial judge) erred in denying his motion to suppress the fruits of the warrantless searches of his home by police officers attempting to find his missing family. Second, he argues that he was denied his right to a fair and impartial jury because the jury pool was tainted by the "saturating and inflammatory" media coverage of the case and because the judge refused during jury selection to probe more deeply into whether prospective jurors had already concluded from the pretrial publicity that the defendant was guilty of the crimes charged. For the reasons detailed below, we affirm the convictions and, after a complete review of the record, decline to exercise our authority under G. L. c. 278, § 33E, to order a new trial or reduce the murder convictions to a lesser degree of guilt.

*Background.* Because the defendant does not challenge the sufficiency of the evidence at trial, we briefly summarize the

---

[1]The defendant also was convicted of unlawful carrying of a firearm, in violation of G. L. c. 269, § 10 (*a*); and unlawful possession of ammunition, in violation of G. L. c. 269, § 10 (*h*). He was sentenced to life in prison without the possibility of parole on the murder convictions and to ten years' probation on the firearm and ammunition convictions, commencing on the date of sentencing, with a special condition of probation that he not profit in any way from the sale of his story.

key evidence supporting the jury's guilty findings, saving for the discussion of the motion to suppress the details leading to the discovery of the bodies inside the house.

The defendant met his wife at the University of York in England, where he was an engineering student and she was a student on her junior year abroad from the College of the Holy Cross. They were both on the crew team, he as a rower and she as a coxswain. After she graduated, she returned to England to earn a teaching certificate and to be with the defendant. In August, 2003, they married, and on April 9, 2005, his wife gave birth to their daughter. After the birth, they decided to move to the United States. The defendant's wife and daughter arrived in August, 2005, living in Carver at the home of his wife's mother and stepfather. The defendant joined them in September.

The stepfather owned various firearms, including a .22 caliber revolver, that were secured by trigger locks and stored in his bedroom closet in Carver. He kept the keys to the trigger locks on the kitchen counter, with a spare set of keys in his bedroom night stand and a second spare set in his truck. The stepfather belonged to a sportsmen's club and twice took the defendant with him to target practice, where the defendant learned how to handle and load the firearms, including the .22 revolver. The defendant's wife showed no interest in firearms and never went with her stepfather to target practice.

Although the defendant's wife was home taking care of their daughter and the defendant had been unable to find work, they leased a four-bedroom single-family house in Hopkinton and moved in during the first week of January, 2006. On January 16, someone using a laptop computer later recovered from the Entwistle home made an Internet search for the phrase "how to kill with a knife" and visited various Web sites that offered escort services in the Hopkinton area. On the afternoon of January 17, someone using the laptop made Internet searches for "knife in neck kill" and "quick suicide method."

The defendant told State Trooper Robert Manning in a telephone call on Monday, January 23, that he had found his wife and daughter dead in the bedroom at approximately 11 A.M. on Friday, January 20, after he had returned home from shopping. He did not contact the police or advise anyone that they were

dead. He stated that after he found their bodies, he went to the kitchen to commit suicide with a kitchen knife, but feared the pain and did not cut himself. Instead, he said, he went to the home of his wife's mother and stepfather in Carver to shoot himself with one of the stepfather's firearms, but the house was locked and he was unable to find a key to gain entry.

The defendant drove to Logan International Airport in Boston and entered the airport parking garage at 8:14 P.M., then left the garage at 9:38 P.M. and returned at 10:49 P.M. He purchased a one-way ticket to London at approximately 7 A.M. on Saturday, January 21, and boarded the 8:20 A.M. flight without any luggage. His wife's mother and stepfather did not learn of the deaths until the bodies were discovered by police on Sunday evening, January 22.

The firearms owned by the stepfather were seized by police from the Carver home and tested after the killings. Police found a stain on the end of the muzzle of the .22 revolver. A swab taken from this stain revealed a mixture of deoxyribonucleic acid (DNA) from at least two individuals, with a major profile that matched the defendant's wife's DNA.[2] In addition, a swab taken from the handle of the revolver contained a mixture of DNA from at least two individuals, with a major profile that matched the defendant's DNA.[3] A swab taken from the trigger lock of the revolver also revealed a mixture of DNA from at least two individuals, with a major profile that matched the defendant's DNA.[4]

Although the defendant claimed that he could not gain entry into the Carver home, the keys to the house were found in the center console of the vehicle that the defendant drove to the airport on the evening of January 20. A spare set of house keys were kept in the dog house in the back yard of the home. Shortly after the killings, the stepfather discovered that this spare set was gone. He also discovered that the spare set of keys to his

---

[2] The probability of a random match was one in 21.82 quadrillion Caucasians, one in 157.9 quadrillion African-Americans, and one in 24.8 quadrillion Hispanics.

[3] The probability of a random match was one in 5.299 trillion Caucasians, one in 369.1 trillion African-Americans, and one in 5.942 trillion Hispanics.

[4] The probability of a random match was one in 159.9 trillion Caucasians, one in 11.2 quadrillion African-Americans, and one in 164.3 trillion Hispanics.

trigger locks that he kept in a night stand in his bedroom was missing.[5]

*Discussion.* 1. *Motion to suppress.* In reviewing a motion to suppress, we "accept as true the subsidiary findings of fact made by the judge absent clear error [and] defer to the credibility findings of the judge, who had the opportunity to observe and evaluate the witnesses as they testified" at the motion hearing. *Commonwealth* v. *Peters*, 453 Mass. 818, 822-823 (2009) (*Peters*). We summarize below the judge's relevant findings of fact, which are supported by the evidence presented at the suppression hearing.

a. *Facts.* On Saturday, January 21, 2006, at approximately 8:25 P.M., the mother of the defendant's wife telephoned the Hopkinton police department and spoke with Sergeant Charles Wallace, who was the patrol supervisor on that shift. She reported that she was concerned about her daughter and son-in-law and their nine month old baby, who had just moved to Hopkinton the previous week. She said she last spoke with her daughter on Thursday, January 19, when she arranged to have lunch with her at her new home in Hopkinton on Saturday. She arrived at the house as arranged, but no one answered the door. She left a note on the front door and went home. She also tried unsuccessfully to call her daughter's cellular telephone.

The mother told Sergeant Wallace that she had just received a telephone call from her daughter's friend, who reported that she and another friend had arranged to have dinner at the Entwistle home that night but that no one answered the door when they arrived. The friend had seen a light in the hallway and heard a dog barking inside. The mother said it was "really unusual for [her daughter] to do this." When Sergeant Wallace asked whether the Entwistles might have gone away unexpectedly, the mother said, "She's the type of girl that calls me whenever she does anything." Sergeant Wallace told the mother that he would send officers to check the house. He then dispatched Sergeant Michael Sutton and Officer Aaron O'Neil to the Entwistle home "on a person check."

---

[5]On Saturday, January 21, 2006, the stepfather of the defendant's wife went target shooting at his sportsmen's club with two of his sons, one of whom observed that the trigger lock on the .22 revolver was not on correctly; it was on but was not "tight and correct."

Sergeant Sutton was the first to arrive at the Entwistle home, and was met by the two friends, who were waiting in the driveway. They explained that they were scheduled to meet the Entwistles for dinner at 5 P.M. but did not arrive until about 7:15 P.M. They had tried to telephone to say that they were running late but no one answered and instead they left voice mail messages. When the friends arrived at the house, no one answered the door even though there were lights on and a dog was barking inside. One of the friends was very anxious. She told Sergeant Sutton that the Entwistle dog was very "pampered" and that the Entwistles would not have gone away without making arrangements for the dog.

The friend told Sergeant Sutton that the Entwistles had one vehicle, a white BMW sport utility vehicle. Sergeant Sutton decided to check the garage to see if the vehicle was there, but the garage had no windows. He walked around the exterior of the house, "which was closed up," and saw that the shades were drawn, but there were lights on. He could hear the dog barking and sounds from a television. He decided to enter the house to check on the occupants, believing that the Entwistles might be inside the home and in need of aid.[6]

Accompanied by Officer O'Neil, who had just arrived, Sergeant Sutton used a plastic card to release the lock on the front door, and the officers entered the residence. Once inside the foyer of the home, the officers entered the kitchen and then split up, with Officer O'Neil going downstairs to determine if the Entwistles' vehicle was in the garage and Sergeant Sutton going into the family room. There, Sergeant Sutton saw that a dog was in a crate and the television was on. He then went upstairs. On the second floor, he heard a radio playing from the "baby's bedroom." Sergeant Sutton looked in the main bathroom

---

[6]Sergeant Sutton testified at the motion hearing that he was concerned that the Entwistles could have been poisoned by carbon monoxide, which he described as "one of the biggest reasons we would go into a house at that time of year under those circumstances." The motion judge in her written findings recognized the unlikelihood of carbon monoxide poisoning where a dog was heard barking inside and wrote that she understood that "Sutton's reference to carbon monoxide in his testimony was by way of example of the types of accidents that can and do disable people in their homes. I credit his testimony that he entered the house because he believed that the Entwistles might be in the home and in need of assistance."

and saw water and toys in the bathtub. Two of the bedrooms appeared unoccupied. The door to the master bedroom was open, and he took one or two steps into the room. He saw a large bed across the room with a comforter "heaped" on top. He did not make further entry into the room or enter the adjoining bathroom. Seeing nobody on the second floor, Sergeant Sutton returned downstairs.

Officer O'Neil met him on the first floor and reported that there was no vehicle in the garage. In the kitchen, Sergeant Sutton noticed a bill from BMW lying on top of some paperwork on a table. The bill was out of its envelope and he could see that the bill was addressed to the defendant's wife and that it listed a vehicle identification number (VIN). Officer O'Neil picked up a digital camera that was in the kitchen and turned it on to determine the date that it had last been used, learning that the most recent photographs were taken on Thursday, January 19. The officers allowed one of the friends into the home to walk the dog and to leave a note for the Entwistles on the kitchen table, but would not allow her to remain in the home. Everyone left the residence, and Sergeant Sutton relocked the front door.

Sergeant Sutton provided the VIN to Sergeant Wallace, who then obtained the registration number for the vehicle. Sergeant Sutton "ran the plate number" and determined that there had been no recent queries by law enforcement agencies regarding the vehicle. He then telephoned local hospitals, but received no information about the Entwistles. Sergeant Wallace then put out a general broadcast at approximately 9:23 P.M. asking any agency having contact with the Entwistles or their vehicle to notify the Hopkinton police department.

At approximately 5:10 P.M. on Sunday, January 22, the mother, stepfather, and the two friends of the defendant's wife arrived at the police station to report that the family was still missing and to file a missing person report. The two friends reported that they had stayed in their vehicle overnight in the Entwistle driveway. They explained that, in the morning, they had been able to reenter the home and retrieve the dog by obtaining from an Entwistle neighbor the electronic keypad code to open the garage door.

Detective Scott Van Raalten then attempted, without success,

to locate the Entwistle vehicle through "OnStar," "LoJack," or a global positioning system tracking device. He also determined that there had been no relevant law enforcement queries about the vehicle. Sergeant Sutton and Officer O'Neil canvassed the neighborhood and were able to speak with four of the seven neighbors; none had met the Entwistles or had seen anything out of the ordinary.

Sergeant Sutton and Detective Van Raalten discussed the "high level of concern" of the friends and family of the defendant's wife and the fact that their continuing efforts to locate the Entwistle vehicle had reached an impasse. They decided to enter the home through the garage door to look at the paperwork on the kitchen table to see if it could provide any information as to the family's whereabouts. They also decided to determine whether the clothes and equipment needed to care for the baby appeared to be missing, which might indicate a planned absence.

They used the electronic keypad code obtained by the two friends to enter the Entwistle garage and then proceeded into the basement that connects the garage to the rest of the house. As they went from the basement to the kitchen, Sergeant Sutton noticed an "unpleasant" odor, like that of "dirty diapers," that had not been there the previous day. They followed the odor to the master bedroom and entered the room. Sergeant Sutton walked to the left side of the bed and saw a woman's watch and a pair of eyeglasses lying on the floor next to the bed. When he lifted a corner of the comforter at the foot of the bed, he saw an "adult female foot." The officers lifted the other end of the comforter and saw a "baby's face and an adult woman lying behind the baby." Both the baby and the woman were obviously dead.

After reporting the bodies to the police department by cellular telephone, they looked through the house in search of the defendant as a possible third victim. Finding nobody else, they secured the premises and obtained a warrant to search the house.

b. *Reasonableness of the warrantless searches.* As to the first search of the house, the judge concluded that, although "the officers did not have reasonable grounds to believe that a crime had been committed, . . . they did have reasonable grounds to believe that the Entwistles might be inside the house in need of

assistance." She also concluded that "[t]he officers limited the scope of their search of the house to that necessary to determine whether an individual inside the house required assistance and to obtain information to locate the vehicle."

As to the second search of the house, the judge noted that the officers' purpose was to seek information as to the whereabouts of the Entwistles; they did not believe that anyone was in the home. The judge found, "based on the totality of the circumstances and, in particular, the extraordinary nature of the Entwistles' disappearance and the lack of any reasonable explanation for [the defendant's wife's] failure to contact [her mother and stepfather], the officers had reasonable grounds to believe that an emergency existed, that the Entwistles were in need of assistance and that evidence shedding light on their whereabouts might be found in the house." The judge concluded that the officers were justified in entering the house to search for this evidence and, when they detected an odor, to investigate its source. We independently review the judge's application of constitutional principles to the facts. *Commonwealth* v. *Phillips*, 452 Mass. 617, 624 (2008). *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996).

A warrantless government search of a home is presumptively unreasonable under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. See, e.g., *Brigham City* v. *Stuart*, 547 U.S. 398, 403 (2006) (*Brigham City*); *Commonwealth* v. *Townsend*, 453 Mass. 413, 425 (2009) (*Townsend*). However, because the "ultimate touchstone" of both the Fourth Amendment and art. 14 is reasonableness, the warrant requirement is subject to certain carefully delineated exceptions. *Townsend*, *supra*, quoting *Brigham City*, *supra*.

One recognized exception to the warrant requirement is the "emergency aid" exception, "which permits the police to enter a home without a warrant when they have an objectively reasonable basis to believe that there may be someone inside who is injured or in imminent danger of physical harm." *Peters*, *supra* at 819. See *Brigham City*, *supra*, quoting *Mincey* v. *Arizona*, 437 U.S. 385, 392 (1978) (emergency aid exception justified by "[t]he need to protect or preserve life or avoid serious injury").

In determining whether entry is justified under the emergency aid exception, we look solely to the objective circumstances known to the police at the time of entry and determine whether those circumstances provide a reasonable basis for the entry. See *Brigham City, supra* at 404; *Peters, supra* at 823-824. A police officer's "subjective motivation is irrelevant." *Brigham City, supra.* See *Michigan v. Fisher,* 130 S. Ct. 546, 549 (2009) (*Fisher*) (motivation of police officers has "no bearing" on whether they needed to enter home to assure that defendant was not endangering others in home).

We have upheld the use of the emergency aid exception where it was objectively reasonable to enter a home without a warrant to provide immediate aid. See, e.g., *Peters, supra* ("objectively reasonable belief that a shooter or a victim in immediate need of assistance may be inside" house where people inside house had been heard arguing, gunshot had been heard that was likely fired from within house, and man had been seen leaving house); *Townsend, supra* at 426 ("objectively reasonable grounds for the police to believe that the victim was inside the defendant's apartment and was in trouble, whether injured by reason of the defendant's abuse or by reason of using cocaine"); *Commonwealth v. Ortiz,* 435 Mass. 569, 573 (2002) ("objectively reasonable grounds to believe that [missing person] was in trouble, whether injured or dead"); *Commonwealth v. Snell,* 428 Mass. 766, 775, cert. denied, 527 U.S. 1010 (1999) ("objectively reasonable grounds to believe that the victim might be injured or dead inside").

"Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Fisher, supra.* It suffices that there are objectively reasonable grounds to believe that emergency aid might be needed. *Id. Peters, supra.* Nor do the police need probable cause to believe that a crime has been committed. See, e.g., *Fisher, supra* at 548-549 (reasonable to enter home to render aid where officers found outside home "signs of a recent injury, perhaps from a car accident" and where defendant was "screaming and throwing things" inside home and if left alone could have "hurt himself in the course of his rage"); *Townsend, supra* (reasonable to enter home to render aid where occupant might have

been incapacitated due to drug intoxication). Where the occupant of a home has reliably been reported missing, the exigency that justifies the entry into the home is the immediate need for aid to prevent physical harm, regardless whether the feared harm arose from a criminal act. See, e.g., *Hunsberger* v. *Wood*, 570 F.3d 546, 555 (4th Cir. 2009), cert. denied, 130 S. Ct. 1523 (2010) ("reasonable officer could conclude that prompt entry was necessary in order . . . to locate a missing girl who might be in harm's way" where there was "evidence that a minor girl was in the home, given that her car was parked in front of the house[,] girl's stepfather said that she was not supposed to be at the home and was exceedingly concerned for her welfare, . . . it was the middle of the night[, and] girl was not answering her cellphone"); *Miller* v. *State*, 380 Md. 1, 39 (2004) ("The police were looking for a teenager who had disappeared without any reason . . . . This was not a criminal investigation . . . , but a legitimate effort to locate and assist a child who may have been in trouble"); 3 W.R. LaFave, Search and Seizure § 6.6(a), at 459 (4th ed. 2004), and cases cited ("Doubtless there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable [including] to seek an occupant reliably reported as missing").

Here, the police made two warrantless searches of the Entwistle home. "We consider separately the lawfulness of the officers' actions in each, keeping in mind that the burden rests with the Commonwealth to demonstrate that a warrantless search, considering the totality of the circumstances, fits within the emergency aid exception to the warrant requirement." *Peters*, *supra* at 823.

i. *The entry on January 21.* When the police first entered the Entwistle home on the evening of January 21, there was an objectively reasonable basis to fear for the health and safety of the Entwistle family. Neither the mother nor stepfather of the defendant's wife, nor her friends, had heard from any of the missing persons since Thursday, January 19. The defendant's wife, who normally called her mother "whenever she does anything," had two days prior invited her mother to lunch at her home, but nobody answered the door when the mother arrived, and the wife had not telephoned to advise her of any change of

plans. The defendant's wife had also previously invited her friends to dinner at her home, but nobody answered the door when they arrived, and the wife had not telephoned either of them to advise of any change of plans. Nor did the defendant's wife answer her cellular telephone when her mother and friend called her. It was unlikely that the family had left the house for the weekend, not only because the wife failed to tell her mother or friends of such a trip, but because the family appeared to have made no arrangements to take care of their "pampered" dog.

Based on this information, although it could not reasonably be foreseen precisely what had happened to the missing family, there was a reasonable basis to believe that something unfortunate might have happened that rendered the defendant's wife unable to communicate with her mother and friends. Although there was no suggestion at that time that any of the Entwistles had been victim to a criminal act, there was abundant reason to fear that the adults in the family had been injured, or worse. Moreover, if the adults were injured, or worse, there was strong reason to fear for the health and safety of their baby, who would be helpless alone to find food or water. Based on the totality of facts known to the police, we conclude that there were objectively reasonable grounds to believe that the Entwistle family might have been in need of assistance inside the house and that warrantless entry into the house was justified under the emergency aid exception. Although the passage of time might have clarified whether the family was at risk, the police were not required to wait, especially where, if the adults were injured, time might have been of the essence in saving the baby from death or serious injury. See *Brigham City, supra* at 406 ("role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties").

Having concluded that the entry was justified, we turn to the second requirement of a warrantless search under the emergency aid exception: whether the conduct of the police following the entry was reasonable in the circumstances, which here means a search for possible victims. See *Peters, supra* at 823. The defendant claims that two aspects of the search exceeded the permissible scope of a search for possible victims: Sergeant Sutton's

retrieval of the VIN of the BMW automobile, and Officer O'Neil's examination of the digital camera to determine the dates of the last photographs taken.

As to the observation of the VIN, the number was printed on the vehicle lease bill lying in plain view on the kitchen table. "Evidence observed in plain view may be seized, but the sweep may not be expanded into a general search for evidence of criminal activity." *Id.*, and cases cited. See *Arizona* v. *Hicks*, 480 U.S. 321, 325 (1987) (*Hicks*) ("Merely inspecting those parts of the turntable that came into view during the [original] search would not have constituted an independent search, because it would have produced no additional invasion of respondent's privacy interest"); *United States* v. *Paneto*, 661 F.3d 709, 714 n.3 (1st Cir. 2011), cert. denied, 132 S. Ct. 2411 (2012) ("Here, neither party disputes that had [the officer] merely bent over to get a closer look at the [item] without picking it up, there would be no constitutional infirmity"). The officer did not open a bill still in its envelope or search for it in a file or drawer; he merely read what was in plain view from an already opened bill that lay on the kitchen table. Such a plain view observation fell within the appropriate scope of a search under the emergency aid exception.

In contrast, Officer O'Neil's observation of the dates of the last photographs taken on the digital camera was not in plain view because he had to "turn on" the camera in order to determine the dates of the photographs. See *id.* ("Under *Hicks*, [*supra*,] it is clear that the Fourth Amendment forbids handling an item to expose something hidden"). We recognize that something more than a search for victims or suspects may be appropriate under the emergency aid exception where entry was made to search for a missing person, the missing person was not found within the house, and there is an objectively reasonable basis to believe that information in the home might shed light on her whereabouts. But we need not reach that issue here because, even if the officer's search of the camera were unconstitutional, it proved harmless. All that was learned from the inspection of the camera was that photographs had last been taken on Thursday, January 19, and this evidence was cumulative of other testimony that the defendant's wife was alive on that day. Having carefully

reviewed the record, we conclude "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Commonwealth* v. *Vasquez*, 456 Mass. 350, 355 (2010), quoting *Commonwealth* v. *Peixoto*, 430 Mass. 654, 660 (2000).

ii. *The entry on January 22.* When the police next entered the house on Sunday, January 22, there was an even greater objective basis to fear for the health and safety of the Entwistle family. Nearly twenty-four hours had passed since the first entry, and there was still no word from the defendant or his wife. Inquiries to local area hospitals in the previous twenty-four hours had yielded no results. The police knew from the first entry that the Entwistle automobile was not in the garage, but no relevant law enforcement query had been made regarding the vehicle and no police department had located the vehicle in response to the Hopkinton police broadcast. The family and friends of the defendant's wife were so concerned that they wished to report the family as missing persons.

In *Peters*, *supra* at 825, we stated that a second warrantless sweep of a home may be lawfully conducted under the emergency aid doctrine when, "in light of all the circumstances known to the officers at the time, there continues to be an objectively reasonable basis to believe that there is someone in the home in need of assistance." See *id.* ("We do not declare a 'one sweep rule' "). Here, before the entry on January 22, Sergeant Sutton subjectively believed that there was no reasonable basis to believe that anyone was in the home because he thought that he had done a "good" and "complete" search of the home the previous evening. His purpose in entering was not to look for possible victims, but for evidence of the family's whereabouts. But the officer's subjective belief and his purpose in making the entry are irrelevant in determining whether there was an objectively reasonable basis to believe that someone might be in need of assistance in the home. See *Fisher*, *supra*; *Brigham City*, *supra* at 404-405.

An objective analyst who knew what Sergeant Sutton knew — that he had taken only one or two steps into the master bedroom, that he did not have an unobstructed view of the entire bedroom from that vantage point, and that he had not

entered the bathroom off the master bedroom — would conclude that the search conducted after the first entry had not reasonably eliminated the risk that a missing person was in need of assistance inside the home. Because the risk that the Entwistle family had suffered serious harm had grown more acute with another day having passed with no sign of the family and no word as to their whereabouts, there continued to be an objectively reasonable basis to enter the home again to search for them in areas that had not yet been searched, including the bathroom adjoining the master bedroom and the unexamined portion of the master bedroom. Contrast *Peters, supra* at 825 ("once three officers had *swept through every room* and saw nothing suspicious, it was extraordinarily unlikely that a dead or injured victim was within the house" [emphasis added]). Therefore, even though this was not the subjective basis relied on by the officers in making this second entry, we conclude that the second entry was justified under the emergency aid exception based on this separate and objectively reasonable basis for the entry.[7]

The scope of their search did not exceed this objectively reasonable basis because, when they smelled the foul odor, the officers reasonably followed the smell of the decomposing bodies to its source. Once they located the bodies, it was within the permissible scope of the search to "go through and look into every single room for any other humans, any place where a human could be." *Mincey* v. *Arizona*, 437 U.S. 385, 392 (1978) (under emergency aid doctrine, "when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises").

For these reasons, we conclude that the second warrantless entry and the scope of the search conducted were justified by the emergency aid exception and that the motion to suppress was correctly denied.[8]

2. *Selection of a fair and impartial jury.* The defendant argues

[7]Because we conclude that the second entry was justified under the emergency aid doctrine as a search for possible victims, we do not reach the issue whether the emergency aid exception (or some variant of the exception) may justify the entry for the purpose of looking for evidence of the possible victims' whereabouts.

[8]Because we conclude that the second search was constitutional under the

that the process of selecting the jury denied him his right to a fair and impartial jury as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. The defendant contends that "extraordinary [and] prejudicial pretrial publicity" entitled him to a presumption that prospective jurors in the venire were prejudiced against him. He also argues that the judge conducted a "shallow and perfunctory voir dire" that failed to address the risk of actual prejudice and that was inadequate to ensure the selection of a fair and impartial jury.

The defendant moved before trial to dismiss the indictments

---

emergency aid doctrine, we do not reach the judge's alternative conclusion that, even if the search were unconstitutional, the evidence obtained from this search would still be admissible on the independent ground of "inevitable discovery." The judge found that, if the police had not reentered the house on January 22, one of the friends of the defendant's wife would certainly have gone to the home that evening, entered the house through the garage by using the electronic keypad code obtained from a neighbor, noted the odor, investigated its source, and discovered the bodies of the defendant's wife and daughter.

Similarly, we do not reach the judge's alternative conclusion that the two searches fell within the "community caretaking" exception to the warrant requirement. See *Cady* v. *Dombrowski*, 413 U.S. 433, 441, 447-448 (1973) (*Cady*). We have noted that the "emergency exception is often equated with the community caretaking function when public safety is involved," *Commonwealth* v. *Knowles*, 451 Mass. 91, 96 n.5 (2008), but the exceptions have different origins and applicability. Compare *Cady*, *supra*, with *Mincey* v. *Arizona*, 437 U.S. 385, 392-393 (1978) (*Mincey*). One difference between these exceptions under Federal law is that a subjective noninvestigative intent is relevant to the community caretaking exception, but not to the emergency aid exception. Compare *Cady*, *supra* at 441-442, with *Brigham City* v. *Stuart*, 547 U.S. 398, 404 (2006). A second potential difference is that, although the "emergency aid" exception applies to warrantless entries into the home, see, e.g., *Mincey*, *supra* at 392, Circuit Courts of the United States Court of Appeals are split as to whether the "community caretaker" exception may justify entry into a home. See, e.g., *Ray* v. *Warren*, 626 F.3d 170, 176-177 (3d Cir. 2010) ("Some circuits [e.g., the Sixth and Eighth] do appear to have relied on the community caretaking exception created in *Cady*[, *supra* at 441, 447-448,] to uphold warrantless entries into houses. . . . We agree with the conclusion of the Seventh, Ninth, and Tenth Circuits on this issue, and interpret the Supreme Court's decision in *Cady*[, *supra*,] as being expressly based on the distinction between automobiles and homes for Fourth Amendment purposes. The community caretaking doctrine cannot be used to justify warrantless searches of a home"). We have not addressed this issue under either the United States or Massachusetts Constitution, and the United States Supreme Court has yet to resolve the split among the various Circuit Courts.

or, in the alternative, for a change of venue based on pretrial publicity regarding this case, and he renewed the motion at least three times during the four days of jury selection. The judge denied the motion without prejudice, declaring that she would revisit the motion at the conclusion of the voir dire of prospective jurors. At the beginning of the fourth day of jury selection, after the defendant renewed the motion, the judge found that the jury pool was not "infected" by the pretrial publicity. She noted that every juror had been asked about exposure to the pretrial publicity, numerous prospective jurors had indicated that they had an opinion with respect to the case, and all those jurors had been dismissed. She saw no reason to think that jurors who had stated that they could be fair and impartial were not responding honestly to her questions, because so many had responded that they could not be fair.

A venire is presumptively prejudiced in the "extreme case" where a trial atmosphere is so "utterly corrupted" by media coverage that a defendant can obtain a fair and impartial jury only through a change in venue. *Skilling* v. *United States*, 130 S. Ct. 2896, 2914-2915 (2010) (*Skilling*), quoting *Murphy* v. *Florida*, 421 U.S. 794, 798 (1975). See *Commonwealth* v. *Toolan*, 460 Mass. 452, 462-463 (2011) (*Toolan*). Where a venire is found to be presumptively prejudiced, a defendant is deemed to be unable to obtain a fair trial from any jury selected from that venire, regardless how carefully the judge performs a voir dire or how many prospective jurors express their belief that they can be fair and impartial. *Id.* at 463, citing *Irvin* v. *Dowd*, 366 U.S. 717, 727-728 (1961), and *Rideau* v. *Louisiana*, 373 U.S. 723, 724-726 (1963). "[P]resumptive prejudice exists only in truly extraordinary circumstances." *Toolan, supra* at 463. Our trial courts have tried many highly publicized cases, but we know of no case where we have found a venire to be presumptively prejudiced. *Id.* at 463 n.17. Pretrial publicity, even where it is "pervasive [and] adverse," is not sufficient alone to support a finding of presumptive prejudice. *Skilling, supra* at 2916, quoting *Nebraska Press Ass'n* v. *Stuart*, 427 U.S. 539, 554 (1976). A defendant is not entitled to a jury that knows nothing about the crime, so long as jurors are able fairly to weigh the evidence in the case, set aside any information they learned

outside the court room, follow the judge's instructions, and render an impartial verdict. *Commonwealth* v. *Leahy*, 445 Mass. 481, 494-495 (2005).

In *Toolan, supra* at 463-464, we noted:

> "In assessing whether such publicity and resulting local prejudice precludes a fair trial, the United States Supreme Court in *Skilling*[, *supra* at 2915-2917,] looked to the influence, if any, of the media on the trial; the size of the community; the content of the news stories; the length of time between the peak media coverage and the trial; and any evidence from the verdict itself, such as the jury's decision to acquit the defendant of any of the charges. This court has likewise identified the nature of the publicity (whether 'extensive *and* sensational') as a highly significant factor. . . . However, we have attached primary importance to the actual ability of the trial judge to empanel jurors who appear impartial." (Citations and footnotes omitted.)

Here, the defendant has failed to demonstrate that this is the exceptional case where, because of the "extraordinary circumstances" of the pretrial publicity, "the community's prejudgment of the case was substantial enough that empanelling impartial jurors would not be possible." *Toolan, supra* at 463, 466. See *Commonwealth* v. *Morales*, 440 Mass. 536, 541-542 (2003). The jury were drawn from Middlesex County, the most populous county in New England, which includes cities, such as Cambridge and Lowell, and many suburban communities within the Boston metropolitan area. "Given this large, diverse pool of potential jurors, the suggestion that [twelve] impartial individuals could not be empaneled is hard to sustain." *Skilling, supra* at 2915. Although the media coverage of the case was extensive, often emotional, and occasionally sensational, the vast majority of the publicity occurred at or around the time of the killings in the first few months of 2006, more than two years before trial commenced in June, 2008, and increased again only with the commencement of trial. See *Toolan, supra* at 465 ("lapse of almost three years between the victim's death and the trial was likely to have blunted the impact of initial media coverage"). Most importantly, having carefully examined the transcript of

the jury selection, we are convinced that the venire was not so poisoned by the pretrial publicity that the judge was unable to empanel jurors who were fair and impartial. Of the twelve deliberating jurors, three said that they had not heard of the defendant or the case until they arrived at the court house for jury duty, and five had heard of the case but recalled nothing more than that the defendant's wife and child were killed and that the husband had been charged with their murder. This was not the "extreme case" where, even with careful voir dire, a fair and impartial jury could not be selected.

Nor do we find that the voir dire conducted by the judge was inadequate to assure the selection of a fair and impartial jury. Before the prospective jurors entered the court room for voir dire, they gave written answers to twenty-seven questions in a jury questionnaire. Among the questions, they were asked to identify any newspapers they regularly read, television programs they regularly watched, radio programs they regularly heard, and Web sites or Web logs ("blogs") that they regularly accessed. They were asked if they had read or heard anything about the case and, if so, the sources of such information. They were asked whether they had discussed the case or overheard others discussing the case either before or after their arrival at the court house that day. They were asked whether they had formed any judgment or opinion "with respect to this case or its merits." And they were asked if they would have any difficulty accepting the presumption of the defendant's innocence, the absolute right of the defendant not to testify, and the Commonwealth's burden of proving the defendant's guilt beyond a reasonable doubt. The jurors were asked separate questions whether they could decide the case "solely on the basis of the evidence that is presented in the courtroom during the trial in a fair and impartial manner applying the law as instructed by the Court," whether they were aware of any bias or prejudice that they might have toward the defendant, and whether there was any reason why they would not be fair and impartial jurors in the case.

The judge also conducted an individual voir dire in which she asked additional questions of prospective jurors who had indicated on the jury questionnaire that they had heard or read

anything about the case. She asked what they had heard or read, and whether what they had heard or read would affect their ability to be fair and impartial in the case. The judge, on her own motion, dismissed many jurors for cause where their answers, either in the jury questionnaire or to her questions, raised a significant doubt as to their ability to be fair and impartial.

Where a prospective juror had heard or read about the case, the defendant requested the judge to ask whether, based on what the juror had heard or read, the juror "thinks [the defendant] is guilty." The judge asked this question of some jurors, but exercised her discretion not to ask it of all jurors, and denied defense counsel's challenges for cause to thirteen jurors, five of whom were seated, because they were not asked this question. The defendant claims that the judge was obligated to ask this question of every juror challenged for cause and that, without an answer to the question, the procedure for selecting the jury could not assure their fairness and impartiality. We disagree. "The scope of voir dire rests in the sound discretion of the trial judge . . . ." *Commonwealth* v. *Bell*, 460 Mass. 294, 303-304 (2011), quoting *Commonwealth* v. *Lao*, 443 Mass. 770, 776-777 (2005), *S.C.*, 450 Mass. 215 (2007), and 460 Mass. 12 (2011). A judge must inquire whether a prospective juror has expressed or formed an opinion on a case or is aware of any bias or prejudice, see G. L. c. 234, § 28, but a judge enjoys the discretion to determine which question or questions will best elicit information from a juror that will allow the judge to evaluate whether the juror is truly fair and impartial. *Commonwealth* v. *Silva*, 455 Mass. 503, 513 (2009), quoting *Commonwealth* v. *Lopes*, 440 Mass. 731, 736 (2004) ("A trial judge, who is aware of the facts of a particular case and can observe firsthand the demeanor of each prospective juror, is in the best position to determine what questions are necessary reasonably to ensure that a particular jury can weigh and view the evidence impartially"). As noted, *supra*, the judge here asked three separate questions in the jury questionnaire designed to elicit whether a prospective juror could be fair and impartial and, where appropriate, asked comparable questions orally during individual voir dire. The judge did not abuse her discretion in refusing to ask the question framed by defense counsel. The judge was not

required to ask prospective jurors to commit themselves during voir dire or present them with the dilemma of choosing between whether they thought the defendant was guilty or not guilty before they had heard any evidence.

After review of the trial transcript, we conclude that the judge conducted a careful, balanced, and thorough voir dire that addressed the risks posed by the pretrial publicity and did not abuse her discretion in concluding that the jury selected were fair and impartial. Where there was neither presumptive prejudice nor actual prejudice from the pretrial publicity and where a fair and impartial jury could be and was empanelled, the judge did not abuse her discretion or commit an error of law in denying the defendant's motion to dismiss the indictments or, in the alternative, for a change of venue.

*Conclusion.* None of the defendant's claims on appeal warrants reversal of the convictions. We have reviewed the entire trial record pursuant to G. L. c. 278, § 33E, and conclude that the defendant received a fair trial that was ably tried and judged. The interests of justice do not require the entry of a verdict of a lesser degree of guilt on the murder convictions or a new trial.

*Judgments affirmed.*