# United States Court of Appeals
## For the First Circuit

No. 13-1779

PHILIP MACDONALD,

Plaintiff, Appellant,

v.

TOWN OF EASTHAM ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Torruella, Circuit Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

Bruce T. Macdonald for appellant.
Thomas R. Donahue, with whom Leonard H. Kesten, Deidre Brennan Regan, and Brody, Hardoon, Perkins & Kesten, LLP were on brief, for appellees Town of Eastham, Sylvia, and Mungovan.
Matthew J. Murphy, General Counsel, Barnstable County Sheriff's Office, for appellee Dinan.

March 12, 2014

---

[*]Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SELYA, Circuit Judge.** This appeal poses the question of whether police officers, responding to a call from a citizen concerned that the door to her absent neighbor's home is standing wide open, have a right to enter the home in pursuance of their community caretaking function. While the answer to this question is freighted with uncertainty, that uncertainty points the way to the proper disposition of the case: because there is no clearly established law that would deter reasonable police officers from effecting such an entry, the individual defendants are entitled to qualified immunity. Consequently, we affirm the district court's dismissal of the action.

Inasmuch as this appeal follows the grant of a motion to dismiss, see Fed. R. Civ. P. 12(b)(6), we weed the facts from the plaintiff's complaint. See Butler v. Balolia, 736 F.3d 609, 611 (1st Cir. 2013).

On the afternoon of November 7, 2009, plaintiff-appellant Philip Macdonald, accompanied by his dog, left his home in Eastham, Massachusetts, for coffee and clamming. His cat, being "[o]f all God's creatures . . . [the] only one that cannot be made the slave of the lash," Mark Twain, Mark Twain's Notebook 236 (1935), remained out and about. To accommodate the feline's comings and goings, the plaintiff left the door to his home wide open as he embarked on his trip.

-2-

That circumstance did not go unnoticed. Forty-five minutes later, a neighbor relayed concerns to the local constabulary about the wide open door at the plaintiff's vacant home. Responding to that call, two Eastham police officers (defendants-appellees Norman Sylvia and Kate Mungovan) interviewed the neighbor. They then approached the plaintiff's house and announced their presence. Receiving no response, they entered the kitchen through the open door.

Finding nothing amiss in the kitchen, the officers proceeded to search the rest of the house. That search revealed the presence of a marijuana-growing operation.

When the plaintiff returned to his abode some 30 minutes later, he was arrested. Following some procedural twists and turns not relevant here, he was charged in state court with offenses related to the manufacture and possession of marijuana. But when a state-court judge suppressed the evidence found in his home, the charges were dropped.

The matter did not end there. With the criminal case laid to rest, the plaintiff's thoughts turned to civil liability. He sued the Town of Eastham (the Town), Officers Sylvia and Mungovan, and crime-scene investigator Terry Dinan (who had assisted in the search) in the federal district court, alleging that they had deprived him of his Fourth Amendment rights in

violation of 42 U.S.C. § 1983.  His complaint also advanced supplemental state-law claims.

The defendants moved to dismiss, and the district court granted the motion.  The court held that the officers were entitled to qualified immunity.  See Macdonald v. Town of Eastham, 946 F. Supp. 2d 235, 243 (D. Mass. 2013).[1]  This timely appeal ensued.

Our review of the grant of a Rule 12(b)(6) motion to dismiss is de novo.  See Butler, 736 F.3d at 612.  We are not bound by the district court's reasoning but, rather, may affirm an order of dismissal on any ground evident from the record.  See Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011).

In this venue, the plaintiff challenges the district court's application of the doctrine of qualified immunity. Addressing that challenge requires us to explore the rudiments of the doctrine and thereafter test the soundness of the district court's decision.

"[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan,

---

[1] The district court also ruled that, on the facts alleged, the Town could not be held liable.  See Macdonald, 946 F. Supp. 2d at 243.  Additionally, it dismissed the state-law claims.  See id. at 244.  On appeal, the plaintiff has abandoned his state-law claims, and he does not challenge the ruling in favor of the Town except to say that it should be reversed were we to vacate the judgment entered in favor of the officers.

555 U.S. 223, 231 (2009) (internal quotation marks omitted). The doctrine "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011). Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). However, the doctrine is not without limits. Despite the breadth of its prophylactic sweep, "qualified immunity does not shield public officials who, from an objective standpoint, should have known that their conduct was unlawful." Haley, 657 F.3d at 47 (internal quotation marks omitted).

Qualified immunity is designed to confer protection from the travails of suit as well as from the imposition of damages. Hence, courts should evaluate claims of qualified immunity at the earliest practicable stage of litigation. See Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam).

This evaluation entails a two-part inquiry. See Haley, 657 F.3d at 47. For one thing, the court must ask "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." Pearson, 555 U.S. at 232. For another thing, the court must ask "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). The court

-5-

need not address these two questions in any particular sequence. See id. at 242.

Here, the answer to the second question is sufficient to resolve the plaintiff's appeal. Consequently, we train the lens of our inquiry on whether, at the time of the intrusion, Fourth Amendment jurisprudence plainly signaled to the individual defendants in this case that their conduct overstepped constitutional boundaries.

The requisite analysis presents a purely legal question. See Walden v. City of Prov., 596 F.3d 38, 53 (1st Cir. 2010). It has two elements. The first element "focuses on the clarity of the law at the time of the alleged civil rights violation"; this element turns on whether the contours of the relevant right were clear enough to signal to a reasonable official that his conduct would infringe that right. Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). The second element is more particularized; it turns on "whether a reasonable defendant would have understood that his conduct violated the plaintiff['s] constitutional rights." Id.

Moving to the specifics of this case, we start with first principles. As a general matter, the Fourth Amendment requires police officers to secure a warrant prior to effecting a non-consensual entry into a person's residence. See Georgia v. Randolph, 547 U.S. 103, 109 (2006). Where, as here, officers enter without a warrant and without consent, their actions must fall

within some recognized exception to the warrant requirement. See United States v. Romain, 393 F.3d 63, 68 (1st Cir. 2004).

In this instance, the defendant officers seek shelter in the community caretaking exception. That exception traces its roots to the Supreme Court's decision in Cady v. Dombrowski, 413 U.S. 433 (1973). The Cady Court, while upholding a warrantless vehicle search, explained that police officers sometimes may "engage in what . . . may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. at 441.

As the law has developed, the community caretaking rubric has become "a catchall for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities." United States v. Rodriguez-Morales, 929 F.2d 780, 785 (1st Cir. 1991). In line with this evolving principle, we have recognized (in the motor vehicle context) a community caretaking exception to the warrant requirement. In delineating this exception, we held that "[t]he imperatives of the fourth amendment are satisfied in connection with the performance of . . . community caretaker tasks [by police officers] so long as the procedure employed (and its implementation) is reasonable." Id.

To be sure, the case at hand is not a motor vehicle case, and the reach of the community caretaking doctrine is poorly defined outside that milieu. This court has not decided whether the community caretaking exception applies to police activities involving a person's home. See United States v. Tibolt, 72 F.3d 965, 969 n.2 (1st Cir. 1995) (leaving question open). The courts of appeals elsewhere are divided on that question. See Ray v. Twp. of Warren, 626 F.3d 170, 175-76 (3d Cir. 2010) (collecting cases and concluding that "[t]here is some confusion among the circuits as to whether the community caretaking exception . . . applies to warrantless searches of the home"). State appellate courts are also split. Compare, e.g., State v. Vargas, 63 A.3d 175, 186 (N.J. 2013) (repudiating "language suggesting that the community-caretaking doctrine permits the warrantless entry into or search of a home in the absence of some form of exigent circumstances"), with, e.g., State v. Deneui, 775 N.W.2d 221, 239 (S.D. 2009) (holding that "homes cannot be arbitrarily isolated from the community caretaking equation"); see also Commonwealth v. Entwistle, 973 N.E.2d 115, 127 n.8 (Mass. 2012), cert. denied, 133 S. Ct. 945 (2013) (leaving question open).

The question is complicated because courts do not always draw fine lines between the community caretaking exception and other exceptions to the warrant requirement. See, e.g., Deneui, 775 N.W.2d at 232 (decrying the "contradictory and sometimes

conflicting" way in which the community caretaking, emergency, and emergency aid doctrines have been applied). The juxtaposition between the community caretaking exception and the emergency aid exception furnishes an apt illustration of this overlap.[2] Some courts have treated emergency aid as a freestanding exception to the warrant requirement. See, e.g., Entwistle, 973 N.E.2d at 127 n.8. Others have classified emergency aid as "a subcategory of the community caretaking exception." People v. Ray, 981 P.2d 928, 933 (Cal. 1999). Indeed, some courts have held that giving the community caretaking exception a life in the home independent and apart from the emergency aid exception "would render the emergency-aid doctrine obsolete." Vargas, 63 A.3d at 189. The other side of the coin is that some courts continue to insist on a sharp line of demarcation between the emergency aid exception and the community caretaking exception. See, e.g., State v. Pinkard, 785 N.W.2d 592, 600 n.8 (Wis. 2010).

The same sort of disarray is evident in the manner in which courts have attempted to define the interface between the exigent circumstances exception to the warrant requirement and the community caretaking exception.[3] For example, some courts "apply

---

[2] Under the emergency aid exception, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Brigham City v. Stuart, 547 U.S. 398, 403 (2006).

[3] A warrantless entry into a residence "may be permitted if 'exigent circumstances' arise." United States v. Samboy, 433 F.3d

what appears to be a modified exigent circumstances test, with perhaps a lower threshold for exigency if the officer is acting in a community caretaking role." Twp. of Warren, 626 F.3d at 176. Other courts steadfastly maintain that the exceptions are not congruent and must be analyzed and applied distinctly. See, e.g., Hunsberger v. Wood, 570 F.3d 546, 554 (4th Cir. 2009).

Given the profusion of cases pointing in different directions, it is apparent that the scope and boundaries of the community caretaking exception are nebulous. The plaintiff appears to concede that this rampant uncertainty exists. Nevertheless, he strives to convince us that, whatever the parameters of the exception, the circumstances here fall outside of it. We are not persuaded.

There is no real dispute about what the defendant officers did: they responded to a call from a concerned neighbor, saw the door to the plaintiff's house standing wide open, announced their presence without receiving a reply, and proceeded to enter the home to ensure that nothing was amiss. They conducted their ensuing search in an unremarkable manner. These actions were at least arguably within the scope of the officers' community caretaking responsibilities — and, given the parade of horribles

_____

154, 158 (1st Cir. 2005). "To show exigent circumstances, the police must reasonably believe that there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant," as "when delay would risk the destruction of evidence." Id. (internal quotation marks omitted).

that could easily be imagined had the officers simply turned tail, a plausible argument can be made that the officers' actions were reasonable under the circumstances. The plaintiff disagrees. He contends that the officers' actions were well outside what the law allows and that any reasonable officer should have known as much.

To evaluate the plaintiff's contention, we must examine whether, at the time of the incident, there were either controlling cases or a consensus of persuasive authorities such that reasonable police officers could not have thought that their actions were lawful. See Barton v. Clancy, 632 F.3d 9, 22 (1st Cir. 2011). Manifestly, there is no directly controlling authority. The question thus reduces to whether a consensus of persuasive judicial decisions exists. We think not.

The plaintiff places heavy reliance on two intermediate state appellate decisions. First, he cites the decision in State v. Christenson, 45 P.3d 511 (Or. Ct. App. 2002), in which the court concluded that "an open door on a summer morning is not, in and of itself, a circumstance that could" justify a home entry under the community caretaking exception. Id. at 513. Second, he cites Kyer v. Commonwealth, 612 S.E.2d 213 (Va. Ct. App. 2005) (en banc), in which the court refused to apply the community caretaking exception based on "only one arguably suspicious circumstance: an open door on an August night." Id. at 217.

-11-

These decisions are admittedly helpful to the plaintiff's position, but they are only two small islands in a sea of confusing case law. Standing alone, they do not comprise the consensus of persuasive authority needed to overcome the defendants' claims of qualified immunity. Other state courts have upheld entries into a dwelling by police officers in circumstances analogous to the circumstances here. For instance, in State v. Alexander, 721 A.2d 275 (Md. Ct. Spec. App. 1998), an intermediate appellate court held that a police entry into a home based upon a neighbor's report of an open basement door and an absent owner was appropriate under the community caretaking exception. See id. at 277, 286-87. So, too, in Ray, the state supreme court employed the community caretaking exception to uphold a home entry by police officers based largely "on a neighbor's report that the front door had been open all day" and that "no one was at home." 981 P.2d at 938 (internal quotation mark omitted).

Even if the cases that run contrary to the plaintiff's position were wrongly decided — a matter on which we take no view — they serve to inject a substantial measure of doubt as to whether the Fourth Amendment barred the officers' entry in this case. That substantial measure of doubt undermines the putative consensus that the plaintiff labors to construct and dooms his appeal. To render a government official's claim of qualified immunity inert, "existing precedent must have placed the statutory or

-12-

constitutional question beyond debate."  al-Kidd, 131 S. Ct. at 2083.  The mixed bag that a canvass of the case law reveals simply does not produce the requisite degree of clarity here.

The short of it is that neither the general dimensions of the community caretaking exception nor the case law addressing the application of that exception provides the sort of red flag that would have semaphored to reasonable police officers that their entry into the plaintiff's home was illegal.  Qualified immunity is meant to protect government officials where no such red flags are flying, see Pearson, 555 U.S. at 231, and we discern no error in the application of the doctrine to this case.

In a last-gasp effort to prevent his case from going up in smoke, the plaintiff tries to change the trajectory of the debate.  Reminding us that "[t]he ultimate standard set forth in the Fourth Amendment is reasonableness," Cady, 413 U.S. at 439, the plaintiff urges that we employ this more general lens instead of the specific filter of community caretaking.  This exhortation has little to commend it.  The Supreme Court has made pellucid that "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  al-Kidd, 131 S. Ct. at 2084.

That guidance is dispositive here.  The generic rubric of "reasonableness" furnishes us no clear indication as to whether a

police officer confronted with a vacant house, an open door, and a worried neighbor ought to know that entering the house is proscribed by the Fourth Amendment.

Let us be perfectly clear. We do not decide today whether or not the community caretaking exception can be applied so as to render constitutional a warrantless and non-consensual police entry into a residence. Nor do we decide whether or not the circumstances that confronted the officers here come within the compass of the community caretaking exception. These questions are down-to-the-wire close — but the very closeness of the questions is telling. Given the nature of the qualified immunity inquiry, it is sufficient to hold — as we do in this opinion — that because these questions are not resolved by clearly established law, the officers who entered and searched the plaintiff's dwelling are entitled to the shield of qualified immunity. We need go no further.

**Affirmed.**