## COMMONWEALTH *vs.* JACK LINDSEY.

No. 07-P-696.

Suffolk. February 11, 2008. - August 29, 2008.

Present: CYPHER, ARMSTRONG, & RUBIN, JJ.

*Firearms. Constitutional Law,* Search and seizure. *Search and Seizure,* Emergency. *Evidence,* Police report, Exculpatory. *Practice, Criminal,* Motion to suppress, Disclosure of evidence, Sentence.

A Superior Court judge did not err in denying the criminal defendant's motion to suppress firearms, ammunition, and silencers that police officers found in his house while they were responding to a call indicating that the defendant's mother was in distress, where the actions of the officers in entering the house without a warrant to search for the ailing woman were reasonable, as there were objectively reasonable grounds to conclude that there existed a real medical emergency that required immediate assistance for the protection of the elderly woman's life. [486-490]

A Superior Court judge did not abuse her discretion in denying the criminal defendant's motion to dismiss the charges against him on the ground that the Commonwealth failed for well over one year to turn over to him a police report that revealed the existence of a witness who was unavailable to testify at trial, where the claim that that witness would have provided exculpatory evidence was speculative. [490-492]

At the trial of indictments charging the defendant with the illegal and unlicensed possession of firearms, the judge properly declined to suspend all but one year of the defendant's sentence on one of the indictments, where G. L. c. 269, § 10(*m*), required the judge to impose a mandatory minimum sentence of imprisonment of two and one-half years. [492-495]

INDICTMENTS found and returned in the Superior Court Department on March 28, 2002.

A pretrial motion to suppress evidence and a motion to dismiss were heard by *Barbara J. Rouse,* J., and the cases were tried before *Margaret R. Hinkle,* J.

*Mark Stevens* for the defendant.

*Anne M. Thomas,* Assistant District Attorney, for the Commonwealth.

RUBIN, J. The defendant was convicted after a jury trial in the Superior Court on fourteen indictments related to the illegal and

unlicensed possession of firearms, after police found firearms, ammunition, and silencers in his house while responding to a call indicating that the defendant's mother was in distress. He argues that the motion judge erroneously denied his motion to suppress the evidence found in his house on grounds that the police entry into his house was unconstitutional, and that the same judge erred in denying the defendant's motion to dismiss because the Commonwealth failed to disclose a police report containing the name and last known address of a potential witness at the suppression hearing. He also argues that the trial judge erred in ruling that the court lacked the discretion to give the defendant the sentence he requested.

## I.

We turn first to the motion to suppress. "In reviewing a motion to suppress, we accept the judge's findings of fact unless they are clearly erroneous, but we independently review the application of constitutional principles to the facts found." *Commonwealth* v. *Allen*, 54 Mass. App. Ct. 719, 720 (2002) (footnote omitted), citing *Commonwealth* v. *James*, 427 Mass. 312, 314 (1998). The defendant urges that evidence deriving from a warrantless search of his home should have been suppressed under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. We summarize the facts found by the motion judge.

During the evening of November 27, 2001, the Chelsea police department received a 911 call. The caller, Minerva Cruz, reported that there was an elderly woman trembling outside her house and asking for help, and that Cruz was concerned for the woman's well-being.[1] Officer Edwin Nelson of the Chelsea police department responded to the call. When he arrived, Cruz told him that, in fact, she had not seen the woman, but instead a neighbor named Jose Cuadrado had seen her. Cuadrado did not speak fluent English, so he found Cruz, who called the police. Cruz, who lived at 32 Cary Avenue, told Officer Nelson that she was familiar with the woman, who lived at 36 Cary Avenue, and that the woman was in failing health. Cruz said that Cuadrado had told her that the woman in the street appeared to be in

---

[1] The 911 call was apparently played at the motion hearing, but its transcript does not appear in the record before us.

ill health and was asking for help and pointing behind her at 36 Cary Avenue. While Cuadrado did not speak English well, he understood enough to think that the woman needed assistance. Cuadrado went to elicit help from Cruz, who called the police. As soon as Cruz called the police, she and Cuadrado went outside. The woman had disappeared. Cruz told Officer Nelson that they had searched the immediate area for the woman, and had been unsuccessful in finding her.

Officer Nelson called Sergeant Joseph Fern, who came to the scene. They concluded that the woman had likely gone back into her house and that she might be in need of emergency medical assistance. They called the fire department to assist in gaining entry to 36 Cary Avenue because no one responded to their knocking and their announcement that the police were there, and to provide emergency medical assistance. At the officers' direction, firefighters used hydraulic tools to open the locked front door. While searching for the woman, the officers entered an unlocked second-floor bedroom where they saw in plain view two handguns on top of a dresser, at least one of which had a silencer on it. Other firearms, gun parts, and ammunition were strewn about the second floor and in plain view.[2] Both the second floor and the first floor, where the defendant's mother lived, were in extremely unsanitary condition, and among other things, there were about fifteen one-gallon drums of fuel in a kitchen on the second floor, some as close as two feet from the stove.

The police did not move the guns. Concerned about public safety given the house's now unlocked door, the officers called Detective Scott Conley of the Chelsea police department to help secure the scene. One of the firefighters also called the inspectional services department because he had questions about the house's fitness for human habitation. When Detective Conley arrived, he inspected the firearms. He confirmed that there were

[2] Officer Nelson testified that he had seen one of the guns in plain view in a half-open drawer of a dresser in the second-floor bedroom; one of the firefighters, Captain John Quatieri, testified that he thought the drawers of the dresser were closed. The motion judge did not make any specific finding whether that particular gun was, in fact, in plain view, but we read her finding that guns, ammunition, and gun parts were in plain view "strewn around the apartment" to encompass it.

no trigger locks on some of the weapons, about half of which were loaded.[3]

The defendant then returned home with his elderly mother, with whom he had been at the hospital. She was wearing a nightgown and was shaking and disoriented. The defendant cooperated with the police, stating that he did not have a firearms identification card or license. He volunteered to retrieve another firearm from his attic and allowed the police to secure and store the weapons at the police station, at least until he could obtain a firearms identification card. Once the police inspected the weapons at the station, they noted that at least one had a defaced serial number, and another was listed as stolen. They also noticed large capacity feeding devices and a silencer for which a license is required.

The question before us is whether the entry into the house and the bedroom on the second floor was permissible under the so-called "emergency exception" to the warrant requirement.

The emergency exception "applies when the purpose of the police entry is not to gather evidence of criminal activity but rather, because of an emergency, to respond to an immediate need for assistance for the protection of life or property. 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' *Mincey* v. *Arizona,* 437 U.S. [385, 392 (1978)], quoting from *Wayne* v. *United States,* 318 F.2d 205, 212 (D.C. Cir.), cert. denied, 375 U.S. 860 (1963)." *Commonwealth* v. *Bates,* 28 Mass. App. Ct. 217, 219 (1990). For the emergency exception to apply, "the burden of proof is on the Commonwealth to show that the warrantless entry falls within the exception and that there were reasonable grounds for the . . . police to believe (an objective standard) that an emergency existed." *Id.* at 219-220. See *Commonwealth* v. *Snell,* 428 Mass. 766, 774-775, cert. denied, 527 U.S. 1010 (1999). This exception applies to a narrow class of circumstances; "[t]he injury sought to be avoided must be immediate and serious, and the mere existence of a potentially harmful circumstance is not sufficient." *Commonwealth* v. *Kirschner,* 67 Mass. App. Ct. 836, 841-842 (2006).

Here there is no question that the purpose of the search was

---

[3]The defendant does not challenge the detective's inspection of the weapons.

to protect life and not to gather evidence of criminal activity. The defendant argues, however, that there were not objectively reasonable grounds for Officer Nelson and Sergeant Fern to believe that an emergency existed. See *Commonwealth* v. *Snell, supra*; *Commonwealth* v. *Ringgard*, 71 Mass. App. Ct. 197, 200-201 (2008). In making that determination, we must evaluate the actions of the police in the proper context and not with 20/20 hindsight. See *Commonwealth* v. *Ortiz*, 435 Mass. 569, 574 (2002), quoting from *Commonwealth* v. *Young*, 382 Mass. 448, 456 (1981) ("The officers were in the midst of a very hectic scene, and their response is 'to be evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis' "). We must, of course, rely only on evidence known to the police at the time of the warrantless entry.

Officer Nelson responded to a report of an elderly neighbor standing outside her house on an evening in late November, trembling and asking for help. He was told by Cruz that she knew the woman and knew she was in ailing health. Officer Nelson was aware that the description of the woman's condition was sufficient to have resulted in Cruz calling 911. The information conveyed to Officer Nelson warranted a conclusion that the woman might be in need of medical assistance. Because Cruz and Cuadrado had been unable to find the woman in the immediate vicinity after calling the police, it was also reasonable to assume that she had returned to her home. When the police, however, knocked on the door of the house and announced their presence, they received no response. At that point, it was reasonable for the police to conclude that a serious medical emergency was occurring, one that could result in death if the afflicted person was not given timely and proper treatment. In such medical emergencies, time is of the essence, requiring swift action. "The reason is plain: 'People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process.' " *Commonwealth* v. *Ringgard, supra* at 201, quoting from *Wayne* v. *United States, supra*.

Thus, there were objectively reasonable grounds to conclude that there existed a real emergency that required immediate assistance for the protection of the elderly woman's life. In these circumstances, the actions of the officers in entering the house

and its rooms to search for the ailing woman were reasonable.[4] The warrantless search thus fell within the emergency exception to the warrant requirement, and the motion to suppress was correctly denied.[5]

## II.

The defendant next argues that the motion judge erred in denying his motion to dismiss where the Commonwealth failed to turn over Officer Nelson's police report for well over one year. The defendant was arrested in November, 2001, and indicted in March, 2002. Police reports were specifically requested in the pretrial conference reports in May, 2002. The Commonwealth, however, provided the report only in September, 2003, immediately before a scheduled hearing on the defendant's motion to suppress. The report revealed to the defense for the first time the existence of one witness, Jose Cuadrado, and his address. The motion judge, appropriately, attempted to address the circumstance of the Commonwealth's delayed disclosure of Officer Nelson's report by granting a continuance of the hearing. The defendant hired a private investigator to interview Cuadrado. The investigator went to the address at which Cuadrado had

---

[4]The defendant's reliance on *Commonwealth* v. *Bates*, 28 Mass. App. Ct. at 219, to show that the police entry here was unjustified is misplaced. In *Bates*, the police received a report of a missing person and, more than three hours later, sent officers to the missing person's apartment. *Ibid.* They entered without a warrant when they thought they heard the volume on a television set in the apartment increase after they first knocked. *Id.* at 218. We held that, given the delay, it was not impracticable for the police to have obtained a warrant, and that the fact that a television set inside the apartment was on or that the volume was raised did not obviate the need for a warrant; that is, that it did not give rise to a reasonable belief that the missing person was in immediate danger. *Id.* at 221-222. Here, as described, the police had ample reason to believe that the elderly woman was both in the house and in need of immediate medical assistance.

[5]The defendant also contends that, even if the initial entry and search were permissible under the emergency exception, the officers' role changed "once [they] saw a handgun and silencer in the defendant's bedroom and did not detect the presence of any people in the room. . . . Any exigency concerns the police may have had were dispelled when they determined no one was in the apartment." While the defendant's major premise is correct that the scope of a warrantless search may be no broader than is justified by the exception permitting it, there is no evidence to support his contention that the police continued to search the second-floor bedroom once they had determined that the elderly woman was not in it.

lived, but found that he had moved a year before. One of the residents believed that Cuadrado moved to Puerto Rico.

"[E]vidence that is in the possession of the government and that could aid materially in the defense of pending charges must be disclosed." *Commonwealth* v. *Miozza*, 67 Mass. App. Ct. 567, 574 (2006). "When a claim has been made that the Commonwealth has lost, destroyed, or otherwise failed to preserve evidence in its possession, custody, or control" — which is in essence what the defendant alleges — "the defendant need not show conclusively the exculpatory nature of the destroyed evidence but, rather, must establish a ' "reasonable possibility, based on concrete evidence rather than a fertile imagination," that access to the [destroyed material] would have produced evidence favorable to his cause.' Thus, the defendant must first establish that it was reasonably possible that the destroyed evidence was exculpatory." *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. 15, 20-21 (1993) (footnote and citation omitted).

Even when a defendant can meet this evidentiary threshold, the motion judge must use a balancing test in determining the appropriate remedy. *Id.* at 21, quoting from *Commonwealth* v. *Charles*, 397 Mass. 1, 14 (1986) ("In determining the appropriateness and extent of the remedy [for loss, destruction, or failure to preserve evidence], the judge must employ a balancing test whereby 'the culpability of the government will be weighed along with the materiality of the evidence and the potential prejudice to the defendant' "). The determination of the appropriate remedy is one that lies within the motion judge's sound discretion. *Commonwealth* v. *Sasville*, *supra* at 21.

Given the weakness of the defendant's evidence of potential prejudice, the motion judge's denial of the motion to dismiss was not an abuse of discretion. The premise of the defendant's argument is, inexplicably, that "Officer Nelson's interview with Jose Cuadrado is the sole basis for the police decision to force an entry into the defendant's home."[6] The defendant argues that the Commonwealth's failure to turn over Officer Nelson's report

---

[6]While Officer Nelson did testify that he spoke with Cuadrado as well as Cruz and that Cuadrado essentially repeated the story Cruz had told him, the focus of Officer Nelson's testimony was on the 911 call and the conversation with Cruz. As our discussion above makes clear, the decision to enter was proper based on all the evidence known to the police, including the 911 call,

and Cuadrado's name and address until Cuadrado was unavailable deprived the defendant of his right to cross-examine and impeach Officer Nelson's testimony.

The defendant neither suggests to what it is he imagines Cuadrado might have testified, nor does he provide any basis for suggesting that Cuadrado would have provided evidence that would have undermined Officer Nelson's testimony with respect to the relevant facts. The likelihood that the lost potential testimony would have been helpful is reduced by the substantial evidence, beyond Officer Nelson's own recounting and including the defendant's own testimony, corroborating Officer Nelson's testimony on the factual issues relevant to our determination that there were reasonable grounds for the police to have concluded that they faced a genuine emergency. This evidence includes the fact of the 911 call; the testimony of Detective Conley that when the defendant returned to the house he was accompanied by his elderly mother who was wearing "a nightgown or something of that nature"; and the defendant's own testimony that his mother had asked him to go to the hospital; that, after he had prepared to take her there, he had unexpectedly found her standing outside the house; that she suffered from dementia; and that she had, on at least one occasion, wandered away from the house.

In the face of this evidence, the claim that Cuadrado would have provided evidence that would have undermined the factual conclusions on which our determination rests, that is, that Cuadrado's failure to testify was prejudicial, is speculative. In these circumstances, we cannot conclude that the motion judge abused her discretion in determining not to employ what the defendant himself, citing *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 314 (1984), recognizes is the "drastic remedy" of dismissal for the Commonwealth's failure.

## III.

Finally, the defendant challenges the propriety of his sentence.

---

the conversation with Cruz, the unanswered knocking on the door and announcing, the attending circumstances, and the reasonable inferences that could be drawn therefrom. The conversation with Cuadrado thus was not the only basis for the challenged police action.

After a jury trial, the defendant was found guilty on fourteen of the indictments against him, and the case proceeded to sentencing. At the sentencing hearing, the defendant requested that the trial judge suspend all but one year of the defendant's sentence on indictment six under G. L. c. 269, § 10(*m*). The Commonwealth argued that the statute required a mandatory minimum sentence of imprisonment of two and one-half years. The trial judge asked the defendant's counsel during the sentencing hearing, "But I don't think I have that power [to impose the defendant's requested sentence] under truth in sentencing, do [I]?"[7] The defendant was sentenced on that indictment to serve not more than two and one-half years and a day, but not less than two and one-half years in State prison, and the trial judge allowed the defendant's motion to stay the sentence, saying, "I think I would appreciate the appellate court's comment on what the statute says with regard to the mandatory sentence."[8]

General Laws c. 269, § 10(*m*), is a confusing statute which has caused courts some consternation and we appreciate the trial judge's difficulty. Section 10(*m*) provides, in relevant part:

> "[A]ny person not exempted by statute who [unlawfully possesses a large capacity weapon or feeding device] therefor . . . shall be punished by imprisonment in a state prison for not less than two and one-half years nor more than ten years. The possession of a valid firearm identification card . . . shall not be a defense for a violation of this subsection; provided, however, that any such person charged with violating this paragraph and holding a valid firearm identification card shall not be subject to any mandatory minimum sentence imposed by this paragraph. The sentence imposed upon such person shall not be reduced to less than one year, nor suspended, nor shall any person convicted under this subsection be eligible for probation, parole,

---

[7]The "Truth in Sentencing" statute, which was enacted five years before § 10(*m*), provides in part that "[s]entences of imprisonment in the state prison shall not be suspended in whole or in part." G. L. c. 127, § 133, inserted by St. 1993, c. 432, § 11. This language "eliminated suspended and so-called split State prison sentences." *Commonwealth* v. *Russo*, 421 Mass. 317, 319 n.2 (1995).

[8]The defendant was sentenced to concurrent terms of three years' probation on each of four other indictments, to commence after completion of his sentence under indictment six. The remainder of his convictions were placed on file.

furlough, work release or receive any deduction from his sentence for good conduct until he shall have served such minimum term of such sentence . . . ."

G. L. c. 269, § 10(*m*), inserted by St. 1998, c. 180, § 70.

The first sentence by its terms requires a sentence of not less than two and one-half years. The Supreme Judicial Court has explained that "not less than" language such as that appearing in § 10(*m*), at least where the statute provides a minimum and a maximum permissible sentence, ordinarily sets out the "mandatory minimum term." See *Commonwealth* v. *Brown*, 431 Mass. 772, 775 (2000).[9]

The third sentence, however, could be construed independently to set out a mandatory minimum of one year of imprisonment.[10] See, e.g., *Commonwealth* v. *Lightfoot*, 391 Mass. 718, 721 (1984) (holding that identical statutory language "indicates the minimum sentence which a judge may impose" and "ensure[s] a . . . mandatory minimum sentence")[11]; *Commonwealth* v. *Berte*, 57 Mass. App. Ct. 29, 32 (2003) (similar statutory language has same effect).[12]

In light of this, and of principles of lenity requiring ambiguous criminal statutes to be construed against the Commonwealth, on a blank slate one might read the statute to impose a mandatory minimum of one year. Cf. *id.* at 33, quoting from *Commonwealth* v. *Marrone*, 387 Mass. 702, 705 (1982) (stating that

---

[9]"Not less than" language does not always create a mandatory minimum. Cf. *Commonwealth* v. *Hines*, 449 Mass. 183, 191 n.4 (2007).

[10]The second sentence of § 10(*m*), which provides that "any such person charged with violating this paragraph and holding a valid firearm identification card shall not be subject to *any* mandatory minimum sentence imposed by this paragraph" (emphasis added), is irrelevant in this case, in which the defendant did not hold such a card.

[11]The statutory language at issue in *Commonwealth* v. *Lightfoot, supra* at 719 n.1, provided in relevant part: "The sentence of imprisonment imposed under this section shall not be reduced to less than two years, nor suspended, nor shall any person convicted under this section be eligible for probation, parole, or furlough or receive any deduction from his sentence for good conduct or otherwise until he shall have served two years of such sentence" (citation omitted).

[12]The statutory language at issue in *Commonwealth* v. *Berte, supra* at 30 n.2, provided in relevant part: "Said sentence shall not be reduced to less than ten years nor shall the person convicted be eligible for probation, parole, furlough, work release or receive any deduction from his sentence for good conduct" (citation omitted).

we "will not interpret a . . . criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the Legislature] intended").

We do not, however, write upon a blank slate. In *Commonwealth v. Semegen, ante* 478, 480 (2008), we have held today that § 10(*m*) imposes a general rule requiring a sentencing judge to impose on those convicted thereunder a mandatory sentence of imprisonment of two and one-half years. We construed the third sentence to refer to reductions in sentence, not to the sentence that must be imposed by the sentencing judge, although, as Justice Green explained, "under applicable good time and parole procedures no such reduction would be possible even in the absence of such a prohibition," so that our construction "risk[ed] rendering the provisions of the third sentence meaningless or superfluous." *Id.* at 483 (Green, J., concurring).[13] That construction represents, as all our decisions do, the considered decision of a majority of the court. See *Sciaba Constr. Corp. v. Boston,* 35 Mass. App. Ct. 181, 181 n.2 (1993). It is binding upon us. Consequently, we leave the sentence imposed by the trial judge undisturbed.[14]

*Judgments affirmed.*

---

[13]Justice Green concluded that the Legislature did not intend a greater mandatory minimum penalty for possession of an ordinary firearm under § 10(*a*) than for possession of a high capacity firearm under § 10(*m*). *Commonwealth v. Semegen, supra* at 484 (Green, J., concurring). The mandatory minimum under § 10(*a*) is now eighteen months, although it is to be served in a house of correction. We note that this incongruity was created only in 2006 by an amendment to § 10(*a*) that raised the mandatory minimum from one year to be served in a house of correction. See St. 2006, c. 48, § 5. None of the other pre-existing subsections of § 10, including § 10(*m*), was altered by that amendment.

[14]The trial judge asked us for guidance on whether a portion of the defendant's sentence could be suspended notwithstanding the "Truth in Sentencing" statute, G. L. c. 127, § 133, which, as described at note 7, *supra,* eliminated suspended and split State prison sentences, that is, those in which a portion of the sentence of imprisonment is suspended. While the after-enacted, specific language of § 10(*m*) prohibiting the sentence from being "reduced to less than one year, []or suspended," might be read to prohibit suspension in full, but to take precedence over § 133 and to permit split sentences like the one sought by the defendant — a construction that would eliminate the superfluity problem identified by Justice Green — we read *Commonwealth v. Semegen, supra,* to foreclose that result.