NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

13-P-1626                                      Appeals Court

COMMONWEALTH vs. JAMES A. GORDON.

No. 13-P-1626.

Essex.      November 14, 2014. - May 5, 2015.

Present: Trainor, Agnes, & Maldonado, JJ.

Search and Seizure, Emergency. Constitutional Law, Search and
     seizure. Practice, Criminal, Motion to suppress, Findings
     by judge.

Complaint received and sworn to in the Peabody Division of the District Court Department on May 17, 2012.

A pretrial motion to suppress evidence was heard by Richard A. Mori, J.

An application for leave to prosecute an interlocutory appeal was allowed by Barbara A. Lenk, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her to the Appeals Court.

Ronald DeRosa, Assistant District Attorney, for the Commonwealth.
Jane D. Prince for the defendant.

AGNES, J.  In this case we consider whether the emergency aid exception to the warrant requirement justified the conduct

of Peabody police officers who responded to a 911 telephone call about a disturbance in a particular apartment on Washington Street and then, based on additional information gathered at the scene, entered the apartment without a warrant. We conclude that the police had an objectively reasonable basis to conclude that the person who requested police assistance might be inside the apartment and in need of emergency aid, and that the warrantless entry did not violate the defendant's rights under the Fourth Amendment to the United States Constitution or art. 14 of the Massachusetts Declaration of Rights. Accordingly, we reverse the order allowing the defendant's motion to suppress evidence seized as a result of the execution of a search warrant following the warrantless entry.[1]

---

[1] The case is before us as a result of the allowance of the Commonwealth's motion for an interlocutory appeal. See Mass.R.Crim.P. 15, as appearing in 422 Mass. 1501 (1996). Based on the evidence seized from the defendant's apartment pursuant to the search warrant, he was charged with unlawful possession of a firearm without a firearms identification card (G. L. c. 269, § 10[h]); unlawful possession of ammunition (G. L. c. 269, § 10[h]); defacing the serial number of a firearm (G.L. c. 269, § 11C); improper storage of a firearm (G. L. c. 140, § 131L); and unlawful possession of a class E substance (G. L. c. 94C, § 34).

On appeal, the Commonwealth does not challenge the judge's rulings that the police lacked probable cause and exigent circumstances to justify a warrantless entry as an investigative measure. The sole issue raised by the Commonwealth is whether the judge was correct in ruling that the police were not justified in conducting a warrantless entry under the emergency aid exception.

Background.  We draw the facts from the judge's findings of
fact, and additional evidence from the two witnesses (Officer
Coup and Sergeant Zampitella) who testified at the hearing on
the motion to suppress, and who were credited by the judge.[2]  At
approximately 8:20 P.M. on May 9, 2012, an unidentified female
telephoned the Peabody police department on its recorded 911
telephone line from Paddy Kelly's bar (bar), located at 154
Washington Street.  The bar is part of a building that contains
three residential apartments.[3]  The caller reported a disturbance
in apartment number one.  Peabody police Officers Coup and
Cecil, as well as Sergeant Zampitella, were dispatched to the
scene, arriving within minutes.  The officers responded directly
to the apartment building's main entrance, which opens into a
foyer area where another door leads to apartment number one and
stairs lead up to apartments numbered two and three.  After
knocking loudly on the outside door, a tenant from apartment two
came downstairs and let them in.  From this point until the

_____

[2] The judge's findings of fact, as they appear in the
section of his written decision captioned "Summary of Facts,"
are entirely consistent with the testimony of the two police
witnesses with only one exception.  See discussion, infra.

[3] When facing at the building, the bar is on the right-hand
side and set slightly below street level.  The three apartments
are located on the left side of the building, and the apartments
share a common entrance located to the left of the bar entrance.
The residential portion of the building has three floors, with
one apartment per floor.  The three apartments also share a
common back door.

officers made their entry into apartment one about fifteen minutes later, an officer was stationed in front of the main entrance to the apartments.

The police learned from the tenant of apartment two that she had not telephoned 911. However, she advised the officers that while in her apartment she overheard an argument between a male and female inside apartment one. She also heard some "crashing" sounds, "[l]ike some things breaking." Officer Coup walked up the stairs to the second floor with the tenant and confirmed that her apartment was directly above apartment one. She told the police that a male tenant (whose name was unknown to her) lived in that apartment. She also related that she knew that the tenant's girl friend was there often, she but did not know the girl friend's name either.

Within minutes of their arrival, the officers knocked on the door of apartment one and announced themselves as police officers. They received no response and did not hear anything from inside the apartment. At that point police dispatch advised them that the 911 call had originated from the bar. Officer Coup went downstairs to the bar. The police maintained surveillance of the door to apartment one, repeatedly knocking and announcing themselves as police officers. The bar is located down several stairs from the street level. Inside the bar, a female bartender identified herself and told Officer Coup

she was the 911 caller. She stated that (1) a female by the name of "Kay" had come into the bar and asked her to call the police; (2) when the bartender asked Kay if she was all right, Kay responded, "no"; (3) Kay's hair was soaking wet, her shirt looked like it had been pulled or stretched, and she was carrying her dog; (4) Kay's tone of voice was "frantic" and she appeared to be "very upset"; and (5) the bartender knew that Kay stayed in apartment one "a lot." The bartender also knew that an unidentified male lived in apartment one. The bartender informed Officer Coup that after Kay asked her to call the police, she (Kay) went out the door of the bar and toward the apartment building entrance. No one saw whether Kay returned to apartment one.[4]

After talking to the bartender for "a few minutes," Officer Coup went back upstairs and discussed the new information with Sergeant Zampitella. Sergeant Zampitella then made the decision to enter the apartment, unsuccessfully attempting to force the door open himself before calling the fire department for assistance.[5] This occurred about fifteen minutes after officers

---

[4] The evidence was that the bar is below street level, and to gain entrance to it one must walk down several steps and turn to the left. From inside the bar it is not possible to see the front door to the three apartments.

[5] Sergeant Zampitella testified that at the moment he made the decision to enter, he had information from the police dispatcher and the tenant from apartment two, and now

first arrived on scene. Before the fire department arrived, the building owner appeared. He informed the police that the tenant in apartment one was the defendant, James Gordon, and that his girl friend Kay often stayed there. He also told officers that the defendant's car was still in the driveway. The building owner let the officers into the apartment. The officers conducted a brief search of the five-room apartment for persons who might be injured or in need of assistance.

Once inside the apartment, officers noticed a number of items in plain sight -- a frying machine and broken glass on the kitchen floor, hypodermic needles out in the open, and some sort of mushroom-growing operation located off the kitchen. None of these objects was touched or moved. After five minutes, having not found any persons, the officers left the apartment.[6]

---

information from the bartender that "a female had gone into the bar requesting help. Her shirt was pulled." The female requested that the bartender call the police. "She -- you know, her hair was wet and she had a pulled shirt. And that's, basically, what we had." It is not significant that Sergeant Zampitella may not have known every detail related by the bartender to Officer Coup, because the law provides that "the knowledge of one [police officer] . . . [is] the knowledge of all." Commonwealth v. Zirpolo, 37 Mass. App. Ct. 307, 311 (1994), quoting from Commonwealth v. Lanoue, 356 Mass. 337, 340 (1969).

[6] Following the initial sweep of the apartment, two Peabody police detectives from the drug squad and two agents from the Bureau of Alcohol, Tobacco, and Firearms were called, and they walked through the apartment. These officers applied for the search warrant the led to the seizure of the firearms, ammunition, and drugs. The defendant did not argue below, and

Discussion.  1.  Standard of review.  In reviewing a ruling
on a motion to suppress, we observe the settled practice that
leaves to the motion judge the responsibility for determining
the weight and credibility of the testimony, because it was that
judge, and not this court, who saw and heard the witnesses.
Commonwealth v. Moon, 380 Mass. 751, 756 (1980).  We subject the
judge's ultimate findings and rulings of law to independent
review.  See Commonwealth v. Scott, 440 Mass. 642, 646 (2012).
See also Commonwealth v. Murphy, 362 Mass. 542, 551 (1972)
(Hennessey, J., concurring) ("[T[he ultimate findings and
rulings of a judge may give rise to a meaningful appeal, even in
a case where his subsidiary findings are beyond practical
challenge").  "We independently review the judge's application
of constitutional principles to the facts."  Commonwealth v.
Entwistle, 463 Mass. 205, 213 (2012).

2.  Assessing the judge's findings and rulings.[7]  a.
Findings not supported by the record.  In support of his
conclusion that the Commonwealth did not meet its burden to
establish that the emergency aid exception justified the

_____

does not contend here, that the second warrantless entry has
independent legal significance.

[7] The facts recited above appear in a portion of the judge's
written decision entitled "Summary of Facts."  In another
section of that decision specifically addressing the issue
before us, the judge made additional findings.  Findings of fact
are not entitled to any greater deference on appeal because they
appear in the judge's conclusions of law.

warrantless entry, the judge made the following additional

finding:

> "In this case the officers had the best of intentions in their effort to conduct a thorough investigation. However, there was no evidence that anyone was in need of immediate, emergency assistance. Any argument was long over by the time the officers arrived. There was no report of physical violence, or demonstration that police had evidence that there was a victim who needed immediate, emergency assistance in the apartment. To the contrary, the alleged victim ("Kay") was apparently uninjured and out of the apartment. There is no basis to believe the alleged victim was in need of emergency help for a life threatening situation. There is no basis to support that she needed emergency aid as envisioned under the emergency exception. The circumstances presented to the police did not support a conclusion that anyone was in a life-threatening situation requiring an immediate, warrantless entry and assistance into a home. . . . Importantly, in this case, the alleged argument was clearly over. Any emergency (if there ever was one) had dissipated given that the alleged victim was out of the apartment physically uninjured, and safe."[8]

Whether we regard these observations as subsidiary

findings, ultimate findings, or a combination of the two, they

are essential to the judge's ultimate conclusion that the

warrantless entry was not justified because no emergency existed

by the time the police entered the defendant's apartment. Even

if we apply the deferential standard that governs the review of

subsidiary findings of fact, the findings that "[a]ny argument

---

[8] In other parts of his decision, the judge repeated some of these subsidiary or ultimate findings, and made others along the same lines, e.g., it was "clear" to the police when they arrived that any disturbance "was no longer occurring"; the police had no information "that anyone was in the apartment"; after speaking to the bartender "it was apparent that 'Kay' was no longer in the apartment"; and "[t]here was no evidence of any safety risk if the officers failed to act immediately."

was long over by the time the officers arrived," and, to the same effect, "the alleged argument was clearly over," along with the finding that "the alleged victim ('Kay') was apparently uninjured and out of the apartment," are clearly erroneous.  A finding is clearly erroneous when it is not supported by the evidence, or when, after a review of the entire record, we are "left with the firm conviction that a mistake has been committed."  Commonwealth v. Tavares, 385 Mass. 140, 156, cert. denied, 457 U.S. 1137 (1982), quoting from New England Canteen Serv., Inc. v. Ashley, 372 Mass. 671, 675 (1977).

The Supreme Judicial Court has observed that "[s]o long as the judge's account is plausible in light of the entire record, an appellate court should decline to reverse it.  'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'"  Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 510 (1997), quoting from Gallagher v. Taylor, 26 Mass. App. Ct. 876, 881 (1989).  After a review of the entire record, we conclude that this is not a case in which the judge decided to credit one of two permissible views of the evidence.  Instead, after making a series of subsidiary findings that have support in the testimony of the witnesses, the judge reached conclusions that are not supported by the evidence.  Cf. Commonwealth v. Holley, 52 Mass. App. Ct. 659, 664 (2001).  In particular, the judge found that

any emergency that may have existed "was long over by the time the officers arrived," and that Kay "was apparently uninjured and out of the apartment." These ultimate or conclusory findings are not supported by the evidence, which the judge credited, that only a few minutes before the police arrived, Kay appeared at the bar looking disheveled, frantic, and "very upset," asked the bartender to call the police, and said that she was not all right.[9]

b. Whether Kay returned to apartment one. The only genuine conflict in the evidence was whether the bartender told the police that Kay returned to the apartment after asking the bartender to call the police. Based on the testimony about the relationship between the apartments and the bar, including two photographs that were introduced as exhibits, the bartender could not have seen whether Kay walked up the steps to the apartment building's outside door once she left the bar. Officer Coup testified initially that the bartender told him that Kay "headed back towards the apartment" after leaving the bar. The judge overruled the defendant's objection to that

---

[9] The judge also found that "[t]he bartender did not observe [that Kay had] any cuts, bruises, or abrasions." This finding is entitled to deference as a subsidiary finding because it is based on a permissible view of the evidence. However, it does not supply an adequate foundation for the judge's other ultimate findings or conclusions that Kay was not injured, that any incident of domestic violence was over, and that she was not in need of emergency assistance.

testimony.  On cross-examination, Officer Coup conceded that the bartender was not in a position to see whether Kay had entered the apartment after leaving the bar, but he testified that in his police report he wrote that the bartender told him that Kay had walked back "towards her apartment."  He added, in reply to a further question by defense counsel, that the bartender may have observed that Kay took a right turn as she left the bar, which was in the direction of the apartment.  The judge found that when Kay left the bar, "[n]o one saw whether Kay went to Apartment #1 or not."

This subsidiary finding is supported by the evidence and is entitled to deference.  Moreover, the judge was not obliged to find, as Officer Coup testified, that the bartender saw Kay turn right when she left the bar.[10]  However, the judge did not explicitly reject that testimony by Officer Coup.  In these circumstances it is open to an appellate court to imply additional findings of fact so long as (1) "the evidence is uncontroverted," and (2) "the judge explicitly or implicitly credited the witness's testimony."  Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008).  Here,

---

[10] The absence of a conflict in the evidence does not mean that the motion judge is required to credit the testimony. See Piemonte v. New Boston Garden Corp., 377 Mass. 719, 733 (1979). Based on considerations of demeanor, narrative consistency, and numerous other subjective factors, a motion judge may reject uncontradicted testimony.  See Commonwealth v. Cataldo, 69 Mass. App. Ct. 465, 472 (2007).

the only evidence on the question of what Kay did after leaving the bar is Officer Coup's testimony, elicited on cross-examination and unaccompanied by a motion to strike, that he recorded in his police report what the bartender told him, which was that the bartender saw Kay turn right when she left the bar. Sergeant Zampitella also testified that this is what Officer Coup told him the bartender had said. See Commonwealth v. Marchione, 384 Mass. 8, 12 (1981). We thus consider this implied finding along with the other subsidiary findings that are supported by the evidence.

3. Application of the emergency aid exception. The emergency aid exception "permits the police to enter a home without a warrant when they have an objectively reasonable basis to believe that there may be someone inside who is injured or in imminent danger of physical harm." Commonwealth v. Peters, 453 Mass. 818, 819 (2009). See, e.g., Commonwealth v. Snell, 428 Mass. 766, 774-775, cert. denied, 527 U.S. 1010 (1999); Commonwealth v. Morrison, 429 Mass. 511, 515 (1999); Commonwealth v. Entwistle, 463 Mass. 205, 213-214 (2012). See also Mincey v. Arizona, 437 U.S. 385, 392 (1978) ("We do not question the right of the police to respond to emergency situations. Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably

believe that a person within is in need of immediate aid" [footnotes omitted]). The exception hinges on the existence of evidence that someone is in need of immediate assistance. See Commonwealth v. Bates, 28 Mass. App. Ct. 217, 219 (1990); Commonwealth v. Lindsey, 72 Mass. App. Ct. 485, 488 (2008). See generally Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 14-1[c][3] (2013/2014).

"[T]he burden of proof is on the Commonwealth to show that the warrantless entry falls within the exception [to the warrant requirement] and that there were reasonable grounds for the . . . police to believe (an objective standard) that an emergency existed." Commonwealth v. Bates, supra at 219-220 (1990). "Reasonableness must be 'evaluated in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis.'" Commonwealth v. Townsend, 453 Mass. 413, 425-426 (2009), quoting from Commonwealth v. Young, 382 Mass. 448, 456 (1981). The law does not require the police to be certain that a person's life is in danger or to know the precise nature of a person's injuries, nor are they required to have probable cause to believe a crime has been committed. "It suffices that there are objectively reasonable grounds to believe that emergency aid might be needed." Commonwealth v. Entwistle, supra at 214.

"Police must often make balanced choices.  Domestic violence situations require police to make particularly delicate and difficult judgments quickly."  Fletcher v. Clinton, 196 F.3d 41, 50 (1st Cir. 1999).  See Georgia v. Randolph, 547 U.S. 103, 118 (2006).  There is a very strong public policy in this Commonwealth against domestic violence.[11]  We think that it is

---

[11] See Commonwealth v. Chretien, 383 Mass. 123, 131-132 (1981).  See also Mitchell v. Mitchell, 62 Mass. App. Ct. 769, 772-773 (2005).  The strong Massachusetts public policy against domestic violence is reflected in numerous legislative enactments such as G. L. c. 209A.  Only last year, a sweeping series of additional measures was adopted by the Legislature to strengthen even further the legal framework designed to prevent domestic violence.  See "An Act Relative to Domestic Violence," St. 2014, c. 260 (Act).  In addition to expanding existing offenses and creating new offenses, see, e.g., domestic assault and domestic assault and battery, St. 2014, c. 260, § 23, amending G. L. c. 265, § 13M, and strangulation or suffocation, St. 2014, c. 260, § 24, inserting G. L. c. 265, § 15D, the Act prohibits the release on bail of a defendant charged with any offense constituting domestic abuse "sooner than 6 hours after arrest except by a judge in open court," and permits special conditions of release to be included in bail orders made prior to a court appearance.  St. 2014, c. 260, §§ 28, 31, 32, amending G. L. c. 276, §§ 42A, 57, 58.  The Act provides that the person who admits the defendant to bail may impose conditions on the defendant's release to ensure not only the defendant's appearance before the court, but also the safety of the alleged victim, any other individual, or the community. Ibid.  The Act provides that in cases involving domestic assault or domestic assault and battery, among others, the Commonwealth is the only party that may move for arraignment in the first three hours after a criminal complaint is signed.  Ibid.  The Act prohibits accord and satisfaction, under G. L. c. 276, § 55, in all cases alleging a criminal act constituting domestic abuse.  See St. 2014, c. 260, § 29.  The Act further requires that a certified batterer's intervention program be ordered when a defendant is convicted or receives a continuation without a finding for the crimes of domestic assault or assault and battery, or strangulation or suffocation.  G. L. c. 265, §§ 13M,

consistent with this strong public policy to recognize that evidence that a person requesting police assistance may have been the victim of domestic violence is a factor that police may consider in determining whether an emergency exists involving a particular individual and whether a warrantless entry is reasonably necessary to render assistance under the emergency aid exception.  As the Washington Supreme Court has observed: "[T]he fact that police are responding to a situation that likely involves domestic violence may be an important factor in evaluating both the subjective belief of the officer that someone likely needs assistance and in assessing the reasonableness of the officer's belief that there is an imminent

---

15D.  If the judge declines to order a certified batterer's intervention program upon conviction or continuation without a finding for these crimes, it must be upon good cause shown and the judge must issue specific written findings describing the reasons that the batterer's intervention program should not be ordered.  Ibid.  The Act substantially expands the training of police officers, prosecutors, and court personnel in the area of domestic violence.  See St. 2014, c. 260, § 1, amending G. L. c.6, § 116A; St. 2014, c. 260, § 5, inserting G. L. c. 12, § 33; and St. 2014, c. 260, § 18, inserting G. L. c. 211B, § 9B.  It imposes on boards of registration for medicine, nursing, physician assistants, nursing home administrators, social workers, psychologists, and mental health professionals a duty to require domestic violence and sexual violence training and education as a condition for licensure.  St. 2014, c. 260, § 9, enacting G. L. c. 112, § 264.  Finally, the Act directs the Department of Elementary and Secondary Education to develop and produce health curriculum and educational materials on domestic violence, teen dating violence, and healthy relationships to be distributed annually to students in grades nine through twelve.  St. 2014, c. 260, § 42.

threat of injury."  State v. Shultz, 170 Wash. 2d 746, 756

(2011).[12]

The defendant contends that this case is controlled by

Commonwealth v. DiGeronimo, 38 Mass. App. Ct. 714, 723-725

_____

[12] We acknowledge that in State v. Shultz, supra, the court
concluded that the police did not have an objectively reasonable
basis for a warrantless entry.  The court noted that the
evidence viewed in the light most favorable to the police was as
follows:  "The police received a phone call from a resident of
an apartment complex about a yelling man and woman.  The
responding officers stood outside and overheard a man and woman
talking loudly.  The officers heard a man say that he wanted to
be left alone and needed his space.  The officers knocked on the
door.  Schultz opened it, appearing agitated and flustered.
Officer Malone asked Schultz about the male occupant of the
apartment. Schultz told her no one was there, but when
confronted with the fact the officers heard voices, summoned
Robertson from a nearby bedroom.  When Robertson appeared, the
officers entered Schultz's apartment based upon her acquiescence
only."  170 Wash. 2d at 760.  In Shultz, the court enunciated
six factors that it regarded as essential to invoke the
emergency aid exception:  "'(1) the [police] officer
subjectively believed that someone likely needed assistance for
health or safety concerns; (2) a reasonable person in the same
situation would similarly believe that there was need for
assistance; and (3) there was a reasonable basis to associate
the need for assistance with the place being searched . . .' (4)
there is an imminent threat of substantial injury to persons or
property, (5) state agents must believe a specific person or
persons or property is in need of immediate help for health or
safety reasons, and (6) the claimed emergency is not a mere
pretext for an evidentiary search."  Id. at 754, quoting from
State v. Kinny, 141 Wash. 2d 373, 386-387 (2000).  Although the
Supreme Judicial Court has not adopted a comparable set of
criteria, we think the Shultz criteria are consistent with the
emergency aid exception under Massachusetts law.  We also
conclude that on the record before us, the police satisfied
these criteria.  It is of particular significance that in the
present case, unlike in Shultz, it was the victim who requested
that the bartender call the police and who told the bartender
that she was not all right after the upstairs tenant heard a
male and a female arguing and crashing sounds coming from the
apartment frequented by the victim.

(1995), in which we concluded that on the fact presented there, the emergency aid doctrine did not authorize the warrantless entry of a home. The <u>DiGeronimo</u> case involved a motor vehicle collision in which the defendant rammed his vehicle into the rear of another vehicle. <u>Id</u>. at 715. The defendant eventually drove away. <u>Ibid</u>. The operator of the other vehicle made observations that led him to conclude the defendant was under the influence of alcohol, but not otherwise injured. <u>Ibid</u>. Shortly thereafter, from his nearby apartment, the defendant telephoned the police to report the accident. <u>Id</u>. at 715-716. The defendant caller sounded to the police to be under the influence of alcohol, but he did not report any injuries or request assistance. <u>Id</u>. at 716. The defendant waited in his apartment "because he thought the police might be coming to question him." <u>Ibid</u>. Meanwhile, a police officer who responded to the scene gathered facts that established probable cause to believe that the defendant had operated a vehicle while under the influence of alcohol. <u>Ibid</u>. Almost an hour later, the officer went to the defendant's apartment. <u>Ibid</u>. The defendant's damaged vehicle car was parked outside. <u>Ibid</u>. From outside the defendant's apartment door, the officer heard a television, but received no response when he knocked and announced himself. <u>Ibid</u>. The police dispatcher called the defendant's home telephone but reported that he received a busy

signal. Id. at 717. The officer decided to make a warrantless entry to check on the defendant's well-being. Ibid. The defendant, who appeared to be under the influence of alcohol, was arrested and transported to the police station. Id. at 717-718.

In DiGeronimo, we rejected the argument that the warrantless entry was justified under the emergency aid exception, because the objective evidence did not support a reasonable belief that an emergency existed. The observations of the defendant made by the other motorist, and the impressions left with the police who received the defendant's telephone report of the collision, strongly suggested that the defendant was impaired by alcohol, but did not suggest that he had suffered any serious physical injuries, was at risk of being injured, or was in need of immediate assistance. "The objective circumstances did not reasonably support a genuine concern on [the officer's] part that DiGeronimo might have been so severely injured in the accident as to be in a life-threatening situation requiring immediate, warrantless entry and assistance." Id. at 725. See Commonwealth v. Bates, 28 Mass. App. Ct. at 219 (no immediate emergency where three hours and twenty minutes passed between 911 call about missing woman and officers arriving at apartment); State v. Beede, 119 N.H. 620, 627-629 (1979), cert. denied, 445 U.S. 967 (1980) (no emergency found where police

waited many hours before conducting search -- emergency can disappear with the passage of time).

This case more closely resembles Commonwealth v. Lindsey, 72 Mass. App. Ct. at 488-490, where we concluded that the police properly relied on the emergency aid exception to conduct a warrantless entry into a house. In Lindsey, a 911 caller reported an elderly woman trembling outside the caller's house and asking for help. Id. at 486. Officers arrived on scene. The caller, a neighbor informed the officers of the elderly woman's poor health. She had been asking for help and pointing behind her at her house, which she shared with her son. Because a search for the woman had proved unavailing, officers concluded that she had likely gone back into her house and that she might be in need of emergency medical assistance. Id. at 487. Because the front door was locked, fire fighters forced it open. Once inside, the police officer's saw a number of incriminating items in plain view, which they seized. Ibid.

In the case before us, the police did not have direct evidence that Kay was the victim of domestic violence, but they had an objectively reasonable basis for the belief that she had been the victim of a domestic violence incident only minutes before they arrived based on the evidence they gathered at the scene. The police also had an objectively reasonable basis for the belief that after requesting police assistance, Kay returned

to the apartment where the incident had occurred, that no one had entered or left that apartment since they arrived at the scene, and that her boy friend, whose vehicle was in the driveway, also was nearby and could be present with her in the apartment.[13]  On the basis of these facts and the reasonable

---

[13] As noted earlier, we give deference to and accept the judge's subsidiary finding that no one saw Kay entering the apartment after speaking to the bartender.  We reject the judge's findings that Kay was uninjured, that whatever incident that occurred earlier between Kay and her boy friend was over by the time the police arrived, and that Kay was not in the apartment at the time of the warrantless entry, as unsupported by the evidence and implausible when considered in relation to the judge's other subsidiary findings of fact, as well as the finding we imply that the bartender reported to Officer Coup that Kay turned right when she exited the bar.  See part 2.b, supra.
  We also disregard a statement made by the judge about what someone who has been the victim of domestic violence would be likely to do after seeking help.  The judge observed that "[c]ertainly if there was a dangerous situation, one would not expect she would have returned to the apartment."  This is not a finding of fact, but instead a generalization about human behavior.  There was no expert witness testimony to support this generalization.  Moreover, such a statement is contradicted by the weight of research findings and clinical evidence about victims of domestic violence and the cycles of violence that they experience.
  Domestic violence is a complex phenomenon that results in psychological and physical injures to a significant number of persons each year regardless of age, economic status, education, or racial or ethnic background.  See generally Breiding, Smith, Basile, Walters, Chen, and Merrick, Prevalence and Characteristics of Sexual Violence, Stalking, and Intimate Partner Violence Victimization -- National Intimate Partner and Sexual Violence Survey, United States, 2011 MMWR 2014:63, No. 8.  The phrase "battered woman's syndrome," which is a misnomer insofar as it suggests that the victim is necessarily suffering from a disease or mental illness, describes "a common pattern in abusive relationships."  G. L. c. 233, § 23F, inserted by St. 1996, c. 450, § 248.  The pattern "typically exhibited by

inferences that could be drawn from them, the police had the right to make a warrantless entry into the apartment to determine if Kay was in need of emergency aid.

Conclusion.  The emergency aid exception is not a broad authorization for the police to make warrantless entries into

---

battered women, include[es] their tendency to leave and then return to the batterer many times before finally ending the relationship." Commonwealth v. Goetzendanner, 42 Mass. App. Ct. 637, 641 (1997).  Victims, usually women, make this choice for many reasons.  Simply leaving an abuser may put a person in more danger than they would be if they were to go back.  See Dutton, The Dynamics of Domestic Violence:  Understanding the Response from Battered Women, 68 Fla. B.J. 24, 26 (1994).  Established patterns of abuse and control might mean that an abused party has become so isolated from friends, family, and employment that they have nowhere to go if they were to permanently leave.  An abused person may not be able to support themselves (or their families) without the additional income that is derived from the abuser.  Moreover, "[b]atterers sometimes try to control their partners by limiting the partner's access to joint income." Enos, Recent Development: Prosecuting Battered Mothers:  State Laws' Failure to Protect Battered Women and Abused Children, 19 Harv. Women's L.J. 229, 246 (1996).  It has also been observed that "[t]o protect their pets, domestic violence victims may delay leaving their homes, or refuse to leave at all."  Nelson, The Connection Between Animal Abuse and Family Violence:  A Selected Annotated Bibliography, 17 Animal L. 369, 373 (2011). Finally, despite the risk of future abuse, a person who is in an abusive relationship might go back into the home because she still loves and cares for her abuser.  See, e.g., Report on Domestic Violence:  A Commitment to Action, 28 New Eng. L. Rev. 313 (1993).  Lastly, there are a myriad of immediate practical concerns that might lead a victim who has called for help to return to the scene of a domestic violence incident, such as a need for a wallet, cellular telephone, or car keys.  We emphasize it is not our intention nor our role to hypothesize reasons for Kay's behavior in this case, but at the same time judges must be cautious to avoid making findings that amount to generalizations or speculation about patterns of human behavior without support in the evidence.

homes to conduct wellness checks whenever the police have a concern that someone may need assistance. It is a narrow exception to the constitutionally-based preference for warrants that arises when there is an objective basis for the belief that an emergency exists and a person is in need of immediate assistance. Evidence that an incident of domestic violence has occurred is not, standing alone, justification for the police to make a warrantless entry into a home to assist the victim. However, the volatility and lethal nature of many domestic violence incidents means that a "rapid police response" may be the only way "to prevent further injury to a victim, to see whether a threat against a victim has been carried out, or to ascertain whether some other grave misfortune has befallen a victim." Commonwealth v. Snell, 428 Mass. at 775. Therefore, when the police have reliable information that a particular individual has been the victim of domestic violence, has requested police assistance, has exhibited signs of distress, may be inside an apartment or home, and despite a prompt response to the request for assistance and an effort to knock and announce their presence, the police receive no response, the conditions exist for a warrantless entry under the emergency aid exception.

For the above reasons, the order allowing the motion to suppress is reversed, and a new order shall enter denying the motion.

<u>So ordered</u>.