NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1319

COMMONWEALTH

vs.

IURY SERENO SETTE.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

On February 25, 2020, Danvers police officers were dispatched to a "domestic in progress involving a firearm." When the police arrived, the 911 caller, William Figueroa, met the officers outside on the porch and told them the fight over the gun was ongoing; the officers immediately entered the home. While inside, officers saw two handguns, a rifle, a bipod rifle stand, ammunition, and jars of marijuana. Police obtained a search warrant for the residence and the defendant subsequently was charged in fourteen indictments with drug and gun offenses.[1] In this appeal, the defendant challenges a Superior Court

_____

[1] On June 28, 2023, the defendant entered a conditional plea. See Commonwealth v. Gomez, 480 Mass. 240 (2018); Mass. R. Crim. P. 12 (b) (6), as appearing in 482 Mass. 1501 (2019).

judge's order denying his motion to suppress evidence seized as a result of the warrantless entry into his home. We conclude that police entry into the defendant's home was justified by the emergency aid exception to the warrant requirement and the officers' actions once inside the home were reasonable under the circumstances. See Commonwealth v. Entwistle, 463 Mass. 205, 213-214 (2012). Accordingly, we affirm.[2]

Discussion. "When reviewing a motion to suppress evidence, we adopt the motion judge's subsidiary findings of fact absent clear error, but we independently determine the correctness of the judge's application of constitutional principles to the facts as found." Commonwealth v. Catanzaro, 441 Mass. 46, 50 (2004). The facts we reference in our discussion are those found by the motion judge, supplemented with undisputed evidence from the motion hearing. See Commonwealth v. Garner, 490 Mass. 90, 94 (2022).

1. Emergency aid exception. "A warrantless government search of a home is presumptively unreasonable under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights." Entwistle, 463 Mass. at 213. "Warrantless searches may be justifiable, however, if the

---

[2] Because we affirm based on the emergency aid doctrine, we do not reach the defendant's additional challenge to the judge's finding that entry into the home was supported by Figueroa's valid consent.

2

circumstances of the search fall within an established exception to the warrant requirement."  Commonwealth v. Arias, 481 Mass. 604, 610 (2019), quoting Commonwealth v. Tuschall, 476 Mass. 581, 584 (2017).  The emergency aid exception to the warrant requirement "permits the police to enter a home without a warrant when they have an objectively reasonable basis to believe that there may be someone inside who is injured or in imminent danger of physical harm."  Commonwealth v. Peters, 453 Mass. 818, 819 (2009).  To justify a warrantless entry into a dwelling under the emergency aid exception, the Commonwealth must demonstrate both objectively reasonable grounds to believe that an emergency existed at the time of entry and that the officers' conduct after entry was "reasonable under the circumstances."  Arias, supra, citing Entwistle, supra, at 216.

The defendant contends that the motion judge erred in finding that emergency aid was required, because there was "no evidence of criminal activity, . . . injuries suffered, or threats made."  He also argues that, even if police entry into the home was justified as emergency aid, their actions exceeded the scope of the emergency.  We disagree.

a.  Reasonableness of officers' entry into the home.  We assess the reasonableness of the entry into a home based on the totality of the circumstances.  Arias, 481 Mass. at 611.  "[A]t the time of entry, there must be an objectively reasonable basis

for the officers to believe that an emergency exists."  Id. at 610.  "In determining whether a warrantless entry is objectively justified, we evaluate it in relation to the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis" (quotation and citation omitted).  Id. "The law does not require the police to be certain that a person's life is in danger or to know the precise nature of a person's injuries, nor are they required to have probable cause to believe a crime has been committed."  Commonwealth v. Gordon, 87 Mass. App. Ct. 322, 329 (2015).  See also Commonwealth v. Knowles, 451 Mass. 91, 96 (2008) (probable cause not required under emergency exception).  "There is a very strong public policy in this Commonwealth against domestic violence."  Gordon, supra, at 330.  Therefore, "[t]he fact that police are responding to a situation that likely involves domestic violence may be an important factor in evaluating both the [officers' belief] that someone likely needs assistance and in assessing the reasonableness of the officer's belief that there is an imminent threat of injury" (quotation and citation omitted). Id. at 331.

Here, officers knew from the police dispatcher that a 911 caller had requested help with family members fighting over a gun inside 134 High Street.  When officers Greene, Santo, and

4

Karedis arrived at the address, they were met by the 911 caller, who identified himself as William Figueroa. Figueroa said he lived there with his sister, Valdilene Figueroa Sette, his brother-in-law, Edson Sette, and his nephew, Iury Sette (the defendant).[3] Figueroa told the officers that Edson and defendant were "currently arguing" upstairs over the defendant's possession of a "big silver gun" in the house. Based on this information, the officers entered the home.

We agree with the motion judge that the circumstances known to the officers -- that a domestic "fight" involving a gun prompted a 911 call and was ongoing when police arrived at the home -- provided an objectively reasonable basis for police to believe that someone inside the home had been harmed or was at imminent risk of physical injury. Contrast Arias, 481 Mass. at 606, 616 (police responded to report of loaded firearm; no indication of conflict within home and residents of apartment building had neither seen nor heard anything indicating imminent danger). We therefore conclude that police had the right to enter the home to determine whether any of the occupants needed emergency aid. See Gordon, 87 Mass. App. Ct. at 334-335.

_____

[3] Because some of the parties share a last name, we refer to those parties by their first names.

5

b.  Reasonableness of officers' conduct after entry.  "To be reasonable, the warrantless conduct of the officers inside the dwelling must be strictly circumscribed by the circumstances of the emergency that justified entry" (quotation omitted).  Arias, 481 Mass. at 612.  Once police entered the home, they immediately went up an open stairway to the second floor.  There was a kitchen on the second floor, directly off the staircase.  From the top of the stairs, Officer Greene could hear "the sound of an argument" coming from an area to the left of the kitchen.  Officer Greene saw Edson, Valdilene, the defendant, and James Osmond (the defendant's friend) arguing in a bedroom adjacent to the kitchen.[4]  Greene announced the officers' presence and explained that they were responding to a domestic dispute involving a firearm.  The officers instructed the group to go into the kitchen, frisked all four people, and asked them where the gun was located.  All four denied that there was a gun in the house.

Shortly thereafter, the patrol supervisor, Sergeant Shabowich arrived at the home.  Officer Greene met Sergeant Shabowich on the front porch and briefed him on the situation.  Figueroa, who had made the 911 call, was also present on the porch.  Greene then told Figueroa that "the people upstairs"

---

[4] Police later learned it was the defendant's bedroom.

denied there was a gun in the house. Figueroa responded that Edson told him that he saw a gun in the defendant's bedroom and that they were fighting over the presence of a gun in the house. Figueroa also said that he last saw the gun in Edson's possession. Officer Greene brought Edson downstairs and asked him again about the gun. Edson admitted that there was a gun and said that he had given it to Valdilene. Officer Greene went back upstairs and asked Valdilene to speak with him privately. He and Valdilene then moved to the primary bedroom, where Officer Greene asked Valdilene to tell him where the gun was and told her he needed to remove it from the house. When Valdilene pulled open a dresser drawer, Officer Greene saw two handguns inside. After he confirmed the guns were unloaded, Officer Greene asked Edson, Valdilene, Osmond, and the defendant if they owned the guns; no one responded. Officer Greene then asked if anyone in the house had a license to possess a gun; again, no one responded.

At that point, Edson, Valdilene, Osmond, and the defendant were still in the kitchen, so Sergeant Shabowich stepped away "to have some privacy" to call his supervisor. In so doing, he moved into the bedroom adjacent to the kitchen where the officers had initially encountered the Sette family members. Officer Greene joined Sergeant Shabowich in the bedroom to ask about the plan moving forward. As he waited for the sergeant to

finish his phone call, Officer Greene saw a rifle barrel sticking up vertically from behind a laundry hamper. He also saw a bipod, which is used to steady a rifle while shooting from the ground or other surface, on top of the same hamper. Officer Greene immediately recognized the objects as a rifle and bipod based on his military experience and training. He then saw what appeared to be marijuana, a loose live round of ammunition on the floor, and two rounds of ammunition on a bureau. Officer Greene showed Sergeant Shabowich the rifle, bipod, ammunition, and drugs, then left the room. Sergeant Shabowich contacted the criminal investigations division, which subsequently obtained a search warrant for the residence.

We are not persuaded by the defendant's argument that any emergency justification for police entry into the home ended when they determined the four occupants were unarmed. Nor was the officers' legitimate concern resolved simply by the group denial that there was a gun in the house. Figueroa's initial report was detailed and based on personal observations. His statement that family members were fighting was confirmed when Officer Greene "heard parties arguing" as he entered the home. Police had no reason to discredit Figueroa's assertion that he saw a gun in the house, and Figueroa's subsequent reaffirmation to police that there was a gun and he had last seen it in Edson's possession justified the further inquiry of Edson.

8

Thus, it was reasonable for the officers to conduct a brief further investigation before simply leaving the home.  See Commonwealth v. Townsend, 453 Mass. 413, 425-426 (2009) (role of police includes preventing violence, not simply rendering first aid to casualties); Commonwealth v. Campbell, 69 Mass. App. Ct. 212, 216 (2007) (duty to investigate cases involving gun where police perceive danger to themselves or members of public).  Contrast Commonwealth v. Kaeppeler, 473 Mass. 396, 403 (2015) (emergency justifying entry into home ended when defendant transported to hospital; continued police presence in home unreasonable).  Here, the officers' continued questioning after the denials remained focused on the officers' valid concern for preventing imminent physical harm.

2.  Conclusion.  We conclude that police permissibly entered the defendant's home to determine whether any of the occupants needed emergency aid based on the report of a domestic dispute involving a firearm.  See Gordon, 87 Mass. App. Ct. at 334.  The officers' actions in the fluid and potentially volatile minutes after their entry into the home were directed at locating the firearm and were necessary to ensure the safety of the occupants, and thus did not exceed the scope of the emergency that justified entry.  See Arias, 481 Mass. at 612.  Because officers were lawfully present, their observations of

9

the rifle, bipod, ammunition, and drugs in plain view did not constitute an unreasonable search.[5]  See Entwistle, 463 Mass. at 217.

Order denying motion to
 suppress affirmed.

By the Court (Englander,
 Hershfang & Brennan, JJ.[6]),

*Paul Little*

Clerk

Entered:  March 6, 2025.

---

[5] The defendant does not challenge Officer Greene's plain view observations beyond contending that police improperly entered the home and their ongoing presence after locating the occupants unharmed and determining no one was in possession of a weapon exceeded the scope of any emergency.

[6] The panelists are listed in order of seniority.